754 So.2d 1 (1999)
Keith BRENNAN, Appellant,
v.
STATE of Florida, Appellee.
No. 90,279.
Supreme Court of Florida.
July 8, 1999.
Rehearings Denied October 21, 1999 and January 18, 2000.
*2 J.L. "Ray" LeGrande of LeGrande & LeGrande, P.A., Fort Myers, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Keith Brennan, who was sixteen years old at the time of the crime. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. For the reasons expressed below, we affirm the conviction and sentences imposed upon Brennan, with the exception that the death penalty is vacated and his sentence reduced to life imprisonment without the possibility of parole. We have affirmed the conviction and death sentence for Brennan's codefendant, Joshua Nelson. See Nelson v. State, 748 So.2d 237 (Fla.1999).

I. FACTS
The evidence presented at trial, viewed in the light most favorable to the State, established the following facts. Brennan, age sixteen, and Nelson, age eighteen, wanted to leave Cape Coral and travel to Fort Lauderdale. The two devised a plan to steal Tommy Owens' car. On March 10, 1995, Brennan and Nelson lured Owens out of his car and Nelson hit Owens with a baseball bat. After a number of hits, Owens eventually fell to the ground. Brennan attempted to slice Owens' throat with a box cutter. Brennan and Nelson also continued to strike Owens a number of times with the bat. The two eventually dragged Owens' body to nearby bushes where Owens later died.
Brennan and Nelson picked up Tina and Misty Porth, and the four left Cape Coral in Owens' car. After stopping in Daytona Beach, the four proceeded to leave the state, eventually ending up in New Jersey. At different times during the trip, Brennan and Nelson informed Tina and Misty that they had murdered Owens. Tina and Misty both testified at trial.
Brennan and Nelson were apprehended in New Jersey. Brennan was charged with first-degree premeditated murder, first-degree felony murder, and robbery with a deadly weapon. Brennan gave a taped confession of his account of the murder, in which he admitted his involvement in the murder but denied that there had been any prior plan to kill Owens. The taped confession was played to the jury. Brennan was found guilty on all three counts.
At the time of the crime, Brennan was a sophomore in high school. He had no significant history of prior criminal activity, and his juvenile records showed only prior crimes against property. His codefendant was eighteen. Professionals who treated Brennan and his family members described him as a follower.
During the penalty phase, Brennan presented evidence that he was two years of age when his mother committed suicide. Prior to her death, his mother was confined to a mental institution and suffered from severe mental depression. When Brennan was approximately eight years of age, he was sexually abused by an older brother for a period of six months. He was small in stature, suffered from a speech impediment, and was often "picked on" by others. In 1993, he received inpatient treatment for drug and alcohol addiction. Brennan had been using LSD the night before the homicide.
After hearing all the evidence, the jury recommended death by a vote of eight to *3 four. The trial judge found four aggravators: (1) the capital felony was committed in the course of a robbery; (2) the capital felony was especially heinous, atrocious, or cruel (HAC); (3) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of legal or moral justification (CCP);[1] and (4) the capital felony was committed for the purpose of avoiding arrest. The judge also considered six statutory mitigators and twenty-five nonstatutory mitigators. The statutory mitigator of age (sixteen) was given great weight and the statutory mitigator of no significant criminal history was given moderate weight. The judge concluded that Brennan had failed to establish the statutory mitigators of (1) extreme emotional disturbance, (2) accomplice with minor participation, (3) acting under the domination of another person, and (4) limited capacity to appreciate the criminality of his conduct. The trial judge weighed each of the nonstatutory mitigators that were established.[2]
While giving significant weight to Brennan's young age and moderate weight to his lack of significant criminal history, the trial court concluded that Brennan had "nonetheless wielded a baseball bat and box cutter to murder another young man." In the end, the trial court followed the jury's recommendation and imposed the death penalty for the first-degree murder charge. The trial judge sentenced Brennan to 160 months imprisonment on the robbery charge. Brennan now appeals, raising fourteen guilt and penalty phase issues.

II. GUILT PHASE ISSUES
Brennan raises five guilt phase issues: (1) the trial court improperly permitted the testimony of a critical witness who was incapacitated; (2) the trial court erred by giving the State advice on trial strategy; (3) the trial court erred in permitting the State to utilize a substitute medical examiner to introduce evidence; (4) the trial court violated Brennan's right to confrontation by admitting a nontestifying codefendant's out-of-court statement; and (5) the trial court erred by failing to properly determine the admissibility of testimony by the State's DNA expert.
In the first and second guilt phase issues, Brennan asserts that the trial court *4 erred in admitting the testimony of a witness who was incapacitated and by giving the State advice on trial strategy regarding this witness. Dr. William Ross Maples, a forensic anthropologist, was called by the State to testify in order to establish that the dental remains found at the crime scene matched Owens' dental records. At the time of the trial, Dr. Maples had been diagnosed with terminal brain cancer. This condition occasionally affected his ability to recall information. Dr. Maples had testified normally months earlier in the Nelson trial; however, during Brennan's trial, Dr. Maples misidentified the dental records in question as belonging to Brennan. As a result, the State requested a recess to discuss Dr. Maples' condition with the court.
The parties met with the trial court to discuss how the examination of Dr. Maples should proceed in light of his condition. During the discussion, the trial court acknowledged that Dr. Maples was "definitely incapacitated." Counsel for Brennan also stated that Dr. Maples "may be incompetent to testify." The parties discussed the possibility of introducing Dr. Maples' testimony from the previous Nelson trial or his deposition in this case. Counsel for Brennan pointed out that Brennan was not a party to the Nelson trial and that there was inadmissible testimony in Dr. Maples' deposition. The trial court and both parties agreed that it would be best for the State to continue questioning Dr. Maples. Thereafter, the trial court stated:
THE COURT: I think you're [the State] gonna have to ask him about that, you know, you identified this x-ray as Keith Brennan, you know, without letting him know. You know, is that correct, I mean, is this x-ray of Keith Brennan, and see what he says.... On the other hand, if you [the State] can say something, you have some physical difficulties now....
After the recess, Dr. Maples identified the dental records as belonging to Owens without objection.
Brennan now asserts that it was error for the trial court to permit Dr. Maples to testify because he was incapacitated. Further, Brennan alleges that the trial court erred by giving the State advice on how to proceed in questioning Dr. Maples. We find that these issues were not preserved for appeal as Brennan's counsel both agreed to the procedure followed by the trial court and failed to make contemporaneous objections at trial either to the trial court's comments or to Dr. Maples' testimony. See generally J.B. v. State, 705 So.2d 1376, 1378 (Fla.1998) (stating that except in cases involving fundamental errors, "to raise an error on appeal, a contemporaneous objection must be made at the trial level when the alleged error occurred").
In his third issue, Brennan alleges that the trial court erred in permitting Dr. Carol Huser, a medical examiner who had not performed Owens' autopsy, to testify as to Owens' cause of death. Whether a witness is qualified to express an expert opinion is a matter within the discretion of the trial judge, and this ruling will not be reversed absent a clear showing of error. See Ramirez v. State, 542 So.2d 352, 355 (Fla.1989). We find this case to be similar to Geralds v. State, 674 So.2d 96, 100 (Fla.1996), where this Court held that the trial judge did not err in permitting a medical expert to testify as to the victim's cause of death, despite the fact that the expert did not perform the autopsy. In that case, we focused on the fact that the substitute examiner developed independent conclusions using objective evidence. See id. In the present case, Dr. Huser testified that in reaching her conclusions she reviewed, among other things, the autopsy report, a report by Dr. Maples, depositions, photographs, and dental records. Therefore, because Dr. Huser made independent conclusions using objective evidence, we find that the trial court did not *5 abuse its discretion in permitting her to testify.
Brennan also claims error regarding the authenticity of the documents upon which Dr. Huser relied. However, this claim is not preserved for appellate review as no objection was raised at trial regarding the authenticity of the documents. See generally J.B., 705 So.2d at 1378.
In issue four, Brennan asserts that the trial court violated his right to confrontation by admitting statements codefendant Joshua Nelson made to other witnesses in Brennan's presence. During trial, Misty Porth testified that "they," meaning Nelson and Brennan, said "don't worry about it" when she questioned them regarding Owens' whereabouts on the night of the murder and that Brennan himself later admitted that he committed the murder. She also testified that on another occasion, when she and her sister questioned Nelson about the details of the crime, Nelson refused to answer until Brennan was present, and when Brennan joined them, they all four discussed the crime.
We discussed this issue in Nelson v. State, 748 So.2d 237 (Fla.1999), where Nelson claimed that the trial court erred in admitting against him statements attributed to Brennan. As we explained, Brennan's silence in the face of Nelson's statements regarding their involvement in the murder amounts to an admission by acquiescence. See Nelson; Farina v. State, 679 So.2d 1151, 1157 (Fla.1996), receded from on other grounds by Franqui v. State, 699 So.2d 1312, 1320 (Fla.1997); Privett v. State, 417 So.2d 805, 806-07 (Fla. 5th DCA 1982). Thus, the statements were properly admitted against Brennan. In addition, we note that Brennan himself made many of the inculpatory statements that were introduced against him.
In issue five, Brennan claims that the trial court erred by failing to properly determine the admissibility of testimony by the State's DNA expert. The identical issue was also discussed in depth in Nelson, wherein we explained that the trial court erred in admitting this testimony under Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923), without first establishing that the expert's source for calculation was generally accepted in the scientific community. However, we explained that the error was not reversible, in light of the fact that the error was helpful to Nelson and in light of the overwhelming evidence of guilt. That analysis applies equally in this case. Brennan never denied his involvement in the murder of Owens. Therefore, we find no reversible error on this point.
Based on the foregoing, we find no reversible error as to the guilt phase issues. Further, after reviewing all of the evidence in the record, we find that there is competent, substantial evidence to support Brennan's convictions of first-degree premeditated murder, first-degree felony murder, and robbery with a deadly weapon. We turn next to the penalty phase issues.

III. PENALTY PHASE ISSUES
Although Brennan raises nine penalty phase issues,[3] one penalty phase issue is dispositive. For the reasons that follow, we conclude that the imposition of the death sentence on Brennan, for a crime committed when he was sixteen years of age, constitutes cruel or unusual punishment in violation of article I, section 17 of *6 the Florida Constitution.[4] In reaching this conclusion, we are guided by our decision in Allen v. State, 636 So.2d 494 (Fla.1994).
In Allen, this Court found the death penalty to be unconstitutional under article I, section 17 of the Florida Constitution if imposed upon one who was under the age of sixteen at the time of the crime. Our reasoning in that case was straightforward:
[M]ore than half a century has elapsed since Florida last executed one who was less than sixteen years of age at the time of committing an offense. In the intervening years, only two death penalties have been imposed on such persons, and both of these later were overturned.
There may be a variety of reasons for this scarcity of death penalties imposed on persons less than sixteen years of age. There may be public sentiment against death penalties in these cases, or prosecutors may simply be convinced that juries would not recommend death or the judge would not impose it. We need not conduct a straw poll on this question, in any event. Whatever the reasons, the relevant fact we must confront is that death almost never is imposed on defendants of Allen's age.

In sum, the death penalty is either cruel or unusual if imposed upon one who was under the age of sixteen when committing the crime; and death thus is prohibited by article I, section 17 of the Florida Constitution. Tillman v. State, 591 So.2d 167, 169 n. 2 (Fla.1991). We cannot countenance a rule that would result in some young juveniles being executed while the vast majority of others are not, even where the crimes are similar. Art. I, Sec. 17, Fla. Const.
636 So.2d at 497 (emphasis supplied) (footnotes omitted).
We further rejected the State's argument that the execution of young juveniles was no different than the execution of women because both seldom happen:
Nothing in the Constitution prohibits any court from taking notice of the peculiar condition and historical treatment of the very young. The law itself for centuries has recognized that children are not as responsible for their acts as are adultsa conclusion also supported by the scarcity of death penalties imposed on the very young in this country.
Id. at 497 n. 6.
In reaching our decision in Allen, we relied on article I, section 17 of the Florida Constitution, and not on either the Eighth Amendment of the United States Constitution or the United States Supreme Court's decision in Thompson v. Oklahoma, 487 U.S. 815, 838, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), which held that execution of a defendant who was fifteen at the time of the crime was prohibited by the Eighth Amendment of the United States Constitution.[5]
*7 Brennan asserts that our reasoning in Allen compels the same result here. We agree. In this case, the defendant presented the trial court with unrefuted data that at least since 1972, more than a quarter of a century ago, no individual under the age of seventeen at the time of the crime has been executed in Florida. In fact, our research reveals that the last reported case where the death penalty was imposed and carried out on a sixteen-year-old defendant was Clay v. State, 143 Fla. 204, 196 So. 462 (1940), over fifty-five years ago. Since 1972, the death penalty has been imposed on only four[6] defendants, other than Brennan, who were sixteen at the time of the crime. For each of the three defendants whose appeals have already been decided, the death sentence was vacated. See Farina v. State, 680 So.2d 392, 398-99 (Fla.1996);[7]Morgan v. State, 639 So.2d 6, 8 (Fla.1994);[8]Brown v. State, 367 So.2d 616, 625 (Fla.1979). This case is virtually identical to Allen both because of the infrequency of the imposition of the death penalty on juveniles age sixteen at the time of the crime and because, since 1972, each death sentence imposed on a defendant who was sixteen at the time of the crime has been overturned by this Court. Thus, we agree that our decision in Allen interpreting the Florida Constitution compels the finding that the death penalty is cruel or unusual if imposed on a defendant under the age of seventeen.
Although not binding on our state constitutional analysis, we are mindful that in the plurality opinion of Stanford v. Kentucky, 492 U.S. 361, 380, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), five members of the United States Supreme Court held that it was not per se cruel and unusual punishment under the Eighth Amendment to impose the death penalty on an individual sixteen or seventeen years of age at the time of the crime.[9] Thus, the Court refused *8 to categorically declare eighteen as the minimum age under the United States Constitution for execution to be a constitutional sentence.[10]See id. at 380, 109 S.Ct. 2969.
However, there is an important aspect of the Stanford opinion that further supports our determination that the imposition of the death penalty in this case would be unconstitutional under both the Florida and United States Constitutions. The plurality in Stanford concluded that the constitutionality of capital punishment statutes depends not on the general state laws defining ages of legal disability, but on the "individualized consideration" given to the defendant's circumstances. Id. at 375, 109 S.Ct. 2969.[11] In order for the death penalty to have been constitutionally imposed on a defendant, the Court concluded that one of the "individualized mitigating factors that sentencers must be permitted to consider is the defendant's age." Id. The majority then observed that "the determinations required by juvenile transfer statutes to certify a juvenile for trial as an adult ensure individualized consideration of the maturity and moral responsibility of 16-and 17-year-old offenders before they are even held to stand trial as adults." Id. (emphasis supplied). The Kentucky and Missouri statutes under consideration in Stanford specifically required a court to give individualized consideration of sixteen-and seventeen-year-old juvenile defendants before determining whether they should be transferred from juvenile court to stand trial as adults. 492 U.S. at 375-76 n. 6, 109 S.Ct. 2969. The Kentucky statute additionally specified a minimum age for the death penalty at sixteen. See id.
*9 Unlike the state statutes cited with approval in Stanford, the Florida statute neither sets a minimum age for the death penalty nor sets forth criteria to "ensure individualized consideration of the maturity and moral responsibility," id. at 376, 109 S.Ct. 2969, of those under eighteen before the child can be tried as an adult and sentenced to death. Section 985.225(1)(a), Florida Statutes (1997), provides that a child of any age may be indicted for a capital crime and, when indicted, "must be tried and handled in every respect as an adult ... on the offense punishable by death or by life imprisonment." Section 985.225(3) further provides that "[i]f the child is found to have committed the offense punishable by death or by life imprisonment, the child shall be sentenced as an adult."
The Legislature's failure to impose a minimum age, the legislative mandate that a child of any age indicted for a capital crime shall be subject to the death penalty, and the failure to set up a system through our juvenile transfer statutes that "ensure[s] individualized consideration of the maturity and moral responsibility" render our statutory scheme suspect under the federal constitution and the reasoning of Stanford as it applies to sixteen-year-old offenders. 492 U.S. at 375, 109 S.Ct. 2969. This also distinguishes our statutory scheme from the Virginia statute recently upheld as constitutional by the Virginia Supreme Court. See Jackson v. Commonwealth, 255 Va. 625, 499 S.E.2d 538 (1998), cert. denied, 525 U.S. 1067, 119 S.Ct. 796, 142 L.Ed.2d 658 (1999). The Virginia statute authorized transfer of juveniles over fourteen, provided for transfer hearings and "address[ed] the prosecution and punishment of juveniles in as much detail as the Kentucky and Missouri statutes" in Stanford. Jackson, 499 S.E.2d at 552.
If given literal effect, our statutory scheme would unconstitutionally authorize the imposition of the death penalty on a child of any age. However, it is uncontroverted that imposing the death penalty on a defendant who was fifteen or younger at the time of the crime is unconstitutional. See Allen, 636 So.2d at 497; Thompson, 487 U.S. at 838, 108 S.Ct. 2687. While we have great respect for the legislative voice, it is the obligation of this Court to decide the question of whether a punishment proscribed by the legislature is unconstitutionally cruel or unusual by applying constitutional, not legislative, standards.
Justice Wells' dissent asserts that the Court has taken a "lone position" in our decision holding the death penalty unconstitutional under our Constitution as applied to sixteen-year-old defendants. Concurring in part, dissenting in part opinion of Wells, J., at 22. We are compelled to point out that, of the thirty-nine states whose statutes authorize the death penalty, fifteen states explicitly prohibit execution of sixteen-year-old defendants. See Concurring in part, dissenting in part opinion of Harding, C.J., note 25 at 19. In the remaining twenty-four states, only six state supreme courts have considered the constitutionality of executing defendants of that age. Apparently none of the states considering the issue except Arizona decided the constitutional question based on their state's constitutional protections. Of those, Alabama, Arizona, Nevada, South Carolina, and Virginia, have upheld the imposition of the death penalty as applied to a defendant who was sixteen at the time of the crime.[12] To the contrary, the Supreme *10 Court of Washington in State v. Furman, 122 Wash.2d 440, 858 P.2d 1092, 1102-03 (1993), held its death penalty statute unconstitutional as applied to juveniles under the age of eighteen, although the Washington state statute provided that a child of any age could be tried and sentenced as an adult.[13]
Finally, in Florida, we have repeatedly stated that the ultimate punishment of death is reserved for the most aggravated and indefensible of crimes committed by the most culpable of offenders. See, e.g., Urbin v. State, 714 So.2d 411, 416 (Fla. 1998); State v. Dixon, 283 So.2d 1, 8 (Fla. 1973). In addition, this Court is constitutionally required to perform a proportionality analysis:
Our proportionality review requires us to "consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990), cert. denied, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). In reaching this decision, we are also mindful that "[d]eath is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation." State v. Dixon, 283 So.2d 1, 7 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). Consequently, its application is reserved only for those cases where the most aggravating and least mitigating circumstances exist. Id.; Kramer v. State, 619 So.2d 274, 278 (Fla.1993)
Terry v. State, 668 So.2d 954, 965 (Fla. 1996). Thus, as the State acknowledges, this proportionality review requires us to compare similar defendants, facts and sentences. See Tillman v. State, 591 So.2d 167, 169 (Fla.1991). The difficulty in conducting a proper proportionality analysis in this case, because the death penalty has not been upheld for any other defendant who was sixteen years old at the time of the crime, highlights the inherent problems in upholding the death penalty under these circumstances.
The State urges that we should find that the imposition of the death sentence constitutional and also proportional because we have upheld the death penalty in other cases involving similar circumstances, citing to cases such as Sliney v. State, 699 *11 So.2d 662 (Fla.1997), cert. denied, 522 U.S. 1129, 118 S.Ct. 1079, 140 L.Ed.2d 137 (1998); Walls v. State, 641 So.2d 381 (Fla. 1994), and Hayes v. State, 581 So.2d 121 (Fla.1991). However, the very cases that the State points to as involving similar circumstances involve adults, not sixteen-year-old juveniles. The only common thread is the brutal and senseless nature of the murders.
These cases demonstrate the dilemma posed by Allen: that death is almost never imposed on defendants who are Brennan's age and when the death sentence has been imposed, the death sentence has been subsequently vacated. There is no doubt that the murder in this case is a deplorable crime and one for which the defendant should spend the rest of his life in prison. However, we cannot impose the death penalty on this defendant who was sixteen at the time of the crime, consistent with our case law and our Constitution. See Allen, 636 So.2d at 497.
Accordingly, the death sentence is vacated and reduced to life imprisonment without a possibility of parole.
It is so ordered.
SHAW and PARIENTE, JJ., and KOGAN, Senior Justice, concur.
ANSTEAD, J., concurs specially with an opinion, in which KOGAN, Senior Justice, concurs.
HARDING, C.J., concurs in part and dissents in part with an opinion, in which WELLS, J., and OVERTON, Senior Justice, concur.
WELLS, J., concurs in part and dissents in part with an opinion.
ANSTEAD, J., specially concurring.
I concur in the majority opinion and note the soundness of its reasoning based upon our controlling precedent in Allen v. State, 636 So.2d 494 (Fla.1994).[14] Not only is the reasoning of the majority sound, but its impact on the status quo is virtually nil based upon Florida's long record of not executing children. I write separately, however, because of my belief in an equally compelling alternative basis for the majority's holding that a child of sixteen may not be constitutionally subjected to the death penalty.
In the present instance we are asked to draw a constitutional line, below which the State will not be allowed to take a child's life as punishment for a crime.[15] For many that line-drawing will be focused on precise ages and the identification of specific values in our society that would tip the scales one way or another in finally settling on a precise age at which we as a *12 society would permit the taking of human life by the State. Others would merely defer to the legislative branch and there would be no constitutional line-drawing to be done. See concurring and dissenting op. at 14 (Harding, C.J., concurring in part, dissenting in part) ("[T]he better way to decide the issue ... is to examine whether the legislature has spoken on the subject.").
However, I believe the question to be less complicated and far more logically framed in terms of how our society has traditionally valued and defined its children and assessed their maturity for purposes of prescribing their rights and responsibilities in society. Using that framework of analysis, I would conclude that based upon the enormous value we place on our children, and our historically consistent treatment of children differently from adults for virtually all legal purposes, but especially for purposes of assessing responsibility and meting out punishment for criminal acts, that the constitutional line should be drawn at age seventeen (17).[16] This is a line we have already purposefully drawn between childhood and adulthood, and we should stand by that well-established line in deciding that we cannot constitutionally permit the execution of our children. This line, in both the way it has served as a common denominator in past line-drawing exercises, and the way it has met the test of time, is a far more reliable measure than any other alternative produced under the exigencies of the actual case being decided. This line, in fact, measures very real differences, in expectations and accountability.
While we have sometimes raised the line upwards, as, for example, in making a policy decision that persons under twenty-one years of age are presumptively not sufficiently mature to consume alcohol, we can look back objectively to a consistent and abiding recognition that a person only becomes sufficiently mature to accept the responsibilities and privileges of adulthood and full citizenship at age eighteen. A list of instances where we have invoked this line is too lengthy to catalog here, but *13 their existence and underlying premise are matters of common knowledge.[17]
It is no coincidence, for example, that we use the age of eighteen as the cutoff for child dependency and for the legal requirement of parents to take care of their children, as well as a dividing line for a countless number of other legal distinctions based upon a firmly established public policy of placing limitations upon and extending special protections to the young and immature. This line is consistent with our traditional attitudes toward children as we have explicitly recognized them generally, and most particularly by our maintenance of a separate juvenile justice system based upon the premise that our children should be treated differently. The line we have drawn between children and adults also represents our determination not to give up on our children, a determination that is obviously at odds with the death penalty, a penalty that totally rejects any value in the continuation of life for a convicted defendant.
Make no mistake about it, a line must be drawn. When the U.S. Supreme Court considered the issue of whether the execution of a teenage child was constitutional, it concluded that there was clearly an age below which the U.S. Constitution would not permit the states to impose the penalty of death. See Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988). The Court's rationale was essentially formulated in an earlier opinion:
[A]dolescents, particularly in the early and middle teen years, are more vulnerable, more impulsive, and less self-disciplined than adults. Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults. Moreover, youth crime as such is not exclusively the offender's fault; offenses by the young also represent a failure of family, school, and the social system, which share responsibility for the development of America's youth.
Eddings v. Oklahoma, 455 U.S. 104, 115 n. 11, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (quoting Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders, Confronting Youth Crime 7 (1978)). That rationale, of course, is the same rationale underlying our fundamental public policy distinguishing between children and adults, and upon which we have constructed our juvenile justice system and purposefully drawn the line there for children at age seventeen and younger.
We should stand by the line we have already drawn, not just when it is easy and convenient, but also when it seems most difficult, as in the emotional turmoil and frenzy that naturally occurs when a terrible crime is committed. In standing firm, we demonstrate the strength of our commitment to our children. Abandoning the clear line we have drawn would seriously undermine our commitment to treating our children differently when that commitment is tested under fire. Finally, when it comes to life or death for children our commitment to our children should match our rhetoric. As Justice Barkett has explained:
When a government withholds the right of a citizen to enjoy certain benefits and privileges because of immaturity and lack of judgment, then for the same reason it also should withhold the imposition of the ultimate and final penalty, which can be imposed only where there is heightened culpability.
LeCroy, 533 So.2d at 759 (Barkett, J., concurring in part, dissenting in part). Nothing is more destructive of a society's values than the perceived hypocrisy that comes when we announce our reliance on well-established standards such as immaturity and lack of judgment for important public policy decisions but quickly abandon those standards in hard cases.
*14 There is also a value to us adhering to this line we have ourselves drawn, rather than turning to international human rights treaties or international or national trends, all of which, of course, draw a clear line between children and adults as a fundamental human rights dividing line for permitting executions.[18] While the U.S. Supreme Court has suggested we may look to the standards in place elsewhere, we as a mature society have already made a clear and valid choice, and we need only stand by it. Surely, however, even under our "evolving standards of decency"[19] in Florida, we have not moved backwards in our assessment of human rights to the point where we consciously choose to kill those whom we have clearly defined as our children.
KOGAN, Senior Justice, concurs.
HARDING, C.J., concurring in part and dissenting in part.
I concur as to Brennan's conviction but respectfully dissent as to his sentence. The majority concludes that the imposition of the death sentence on Brennan for a crime committed when he was sixteen years of age constitutes cruel or unusual punishment in violation of article I, section 17 of the Florida Constitution. While I concurred in Allen v. State, 636 So.2d 494 (Fla.1994), I now find its reasoning flawed. The better approach would be to decide this issue in conformance with the legislative history on the subject, as suggested by the United States Supreme Court's decision in Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989).
In Allen, this Court held that article I, section 17 of the Florida Constitution prohibited the imposition of the death sentence on a defendant who was fifteen years of age at the time of the offense. The majority in the present case cites to the following passage from Allen:
[M]ore than half a century has elapsed since Florida last executed one who was less than sixteen years of age at the time of committing an offense. In the intervening years, only two death penalties have been imposed on such persons, and both of these later were overturned.
There may be a variety of reasons for this scarcity of death penalties imposed on persons less than sixteen years of age. There may be public sentiment against death penalties in these cases, or prosecutors may simply be convinced that juries would not recommend death or the judge would not impose it. We need not conduct a straw poll on this question, in any event. Whatever the reasons, the relevant fact we must confront is that death almost never is imposed on defendants of Allen's age.
In sum, the death penalty is either cruel or unusual if imposed upon one who was under the age of sixteen when committing the crime; and death thus is prohibited by article I, section 17 of the Florida Constitution. Tillman v. State, 591 So.2d 167, 169 n. 2 (Fla.1991). We cannot countenance a rule that would result in some young juveniles being executed while the vast majority of others are not, even where the crimes are similar. Art. I, § 17, Fla. Const.
Id. at 497 (footnotes omitted). In essence, the majority's reasoning in Allen was that because fifteen-year-old offenders are rarely sentenced to death, the punishment must be unusual in violation of article I, section 17 of the Florida Constitution. I believe that an analysis of the unusual element has to include more than simply *15 asking how often the punishment is imposed.
There are several flaws with the majority's reasoning in this case and in Allen. First and foremost, the Allen standard does not allow for a change in public opinion on this issue. To make this point, assume for purposes of argument, as this Court stated in Allen, that the death penalty is rarely imposed on sixteen- or fifteen-year-old offenders because "there is public sentiment against death penalties in these cases." Allen, 636 So.2d at 497. If this is true, what happens if the citizens change their minds? What if it can be demonstrated in the future that the citizens of this state overwhelmingly support the death penalty for sixteen-year-old offenders? Once the Allen standard is put in place, it can never be changed. Even if a majority of people favored the death penalty for sixteen-year-old offenders, the bottom line of Allen is that since a particular punishment has rarely been imposed up until this point, such a punishment cannot be imposed now.
Another concern with the majority's analysis is the potential effect it will have in other analogous situations. For example, if this state decides to alter its method of execution, will the first time the new method is used be unusual and thus subject to constitutional scrutiny, simply because it has never been used before? Will the majority's reasoning apply in such a circumstance?
As pointed out by this Court in Allen, one can imagine several reasons that would explain why the number of executions for sixteen-year-old offenders is low; namely, very few sixteen-year-olds are committing capital crimes, and prosecutors and juries are hesitant to impose the death penalty on sixteen-year-olds unless the circumstances are extreme. Allen, 636 So.2d at 497. See also Stanford, 492 U.S. at 374, 109 S.Ct. 2969 ("To the contrary, it is not only possible, but overwhelmingly probable, that the very considerations which induce petitioners and their supporters to believe that death should never be imposed on offenders under eighteen cause prosecutors and juries to believe that it should rarely be imposed."). Yet, this fact alone cannot possibly be the basis for declaring a punishment constitutionally infirm. Certainly, this Court's focus should extend beyond mere happenstance when making this critical decision.
Justice Grimes and Justice Overton both wrote separate concurring opinions in Allen. Neither justice agreed with the reasoning of the majority. Instead, both justices pointed out that the issue was controlled by the United States Supreme Court's decision in Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), which decided six years earlier that the federal constitution prohibited the imposition of the death penalty on a person who was under sixteen years of age at the time of the crime. See Allen, 636 So.2d at 498 (Grimes, J., concurring). I now agree that this was the better way to decide the issue in Allen. Because there is no federal constitutional bar to the imposition of the death penalty on a sixteen-year-old offender, see Stanford, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306, I believe the better way to decide the issue in the present case is to examine whether the legislature has spoken on the subject.
In LeCroy v. State, 533 So.2d 750 (Fla. 1988), this Court determined that imposing the death penalty on a person who was seventeen years old at the time of the crime did not violate the prohibition against cruel and unusual punishment.[20] To make this determination, the Court focused on the legislative history regarding capital punishment and juveniles:
Florida law generally recognizes distinctions between juveniles and adults but section 39.02(5)(c), Florida Statutes *16 (1979-1987), mandates that a child of any age charged with a capital crime "shall be tried and handled in every respect as if he were an adult." (Emphasis supplied.) The words "every respect" could not be clearer and can only be read as a declaration of legislative intent that persons under eighteen years may be subject to the same penalty as an adult. This has been the long-standing law in Florida. Prior to 1950, the Florida Constitution vested jurisdiction over all criminal charges against juveniles in criminal courts, i.e., not in juvenile courts, and all juveniles were tried as adults. The constitution was amended in 1950 to authorize the legislature to confer criminal jurisdiction on cases involving juveniles in juvenile courts. [[21]] The legislature responded by enacting chapter 26880, section 1, Laws of Florida (1951), codified as chapter 39, Florida Statutes (1951). Under chapter 39, jurisdiction for violations of law allegedly committed by a child, then defined as a person under seventeen years of age, was removed from criminal courts and placed in either juvenile courts or county courts in those counties where no juvenile court existed. §§ 39.01, .02, Fla.Stat. (1951). Section 39.02(6), Florida Statutes (1951), granted discretion to the juvenile court to transfer felony charges against children fourteen years of age or older to criminal courts, except "that a child sixteen years of age or older who, if an adult, would be charged with a capital offense, shall be transferred." (Emphasis supplied.) Since 1951, the legislature has steadily expanded the transfer of criminal charges from juvenile to criminal courts and has, similarly, expanded and reiterated its decision that juveniles charged with capital offenses be tried and handled as adults.
In 1955, the legislature amended section 39.02(6) by deleting "sixteen years or older" and providing that any child, irrespective of age, indicted by a grand jury for an offense punishable by death or life imprisonment shall be tried in criminal court. Section 39.02(6) was further revised, and legislative intent made even clearer in 1967 and 1969 by providing:
(c) When an indictment is returned by the grand jury charging a child of any age with a violation of Florida law punishable by death, or punishable by life imprisonment, the juvenile court shall be without jurisdiction, and the charge shall be made, and the child shall be handled, in every respect as if he were an adult.

39.02(6)(c), Fla.Stat. (1969) (emphasis supplied).
In 1973, the legislature substantially rewrote chapter 39. Exclusive original jurisdiction of charges against juveniles was returned to the circuit court and provisions were made whereby the court could try any child fourteen years of age or older as an adult on any criminal charge. A child was also redefined as any person under eighteen years of age. Ch. 73-231, §§ 2, 3, Laws of Fla. (1973). In 1978, the legislature rewrote and recast section 39.02, providing that a child once tried as an adult would thereafter be subject to prosecution, trial, and sentencing as an adult for any subsequent criminal violations. Ch. 78-414, § 3, Laws of Fla. (1978). Finally, in 1981, *17 the legislature further amended the recast 39.02(5) by providing that trials of offenses punishable by death or life imprisonment would include trials of any other criminal violations connected with the primary offense. Further, if convicted of the offenses punishable by death or life imprisonment, "the child shall be sentenced as an adult." Ch. 81-269, § 1, Laws of Fla. (1981) (codified at § 39.02(5)(c), Fla. Stat. (1981)).
Several points are clear from the legislative history recounted above. First, legislative action through approximately the last thirty-five years has consistently evolved toward treating juveniles charged with serious offenses as if they were adult criminal defendants. Second, since 1951, the legislature has repeatedly reiterated the historical rule that juveniles charged with capital crimes will be handled in every respect as adults.
Id. at 756-57 (footnotes omitted). An examination of this legislative history reveals a distinct cut-off line between offenders that are sixteen or older and offenders under the age of sixteen. The very first statute that dealt with this issue specifically mandated that "a child of sixteen years of age or older who, if an adult, would be charged with a capital offense, shall be transferred." § 39.02(6), Fla. Stat. (1951) (emphasis supplied). As evidenced by the history set forth in LeCroy, the minimum age for capital punishment has never risen above sixteen.
A comparison of LeCroy and Allen demonstrates that the two opinions are in conflict. Although Allen specifically deals with fifteen-year-old offenders, the opinion can be read to encompass juveniles in general (children under the age of eighteen):
We do not find persuasive the State's argument that execution of young juveniles is no different than the execution of women, in that both seldom happen. Nothing in the Constitution prohibits any court from taking notice of the peculiar condition and historical treatment of the very young. The law itself for centuries has recognized that children are not as responsible for their acts as are adultsa conclusion also supported by the scarcity of death penalties imposed on the very young in this country. On the other hand, adult women and men committing similar crimes must be treated the same under the rule of equal protection.
Allen v. State, 636 So.2d 494, 497 n. 6 (Fla.1994). Essentially, the Allen court stated that juveniles are treated differently from adults under the laws of this state. Chapter 985, Florida Statutes (1997), which codifies the juvenile justice system in Florida, defines "juvenile" or "child" as "any married or unmarried person who is charged with a violation of law occurring prior to the time that person reached the age of 18 years." § 985.03(6), Fla. Stat. (1997). Using the logic of Allen, all juveniles, including seventeen-year-olds, fall within the purview of the Allen test. The majority in this case and in Allen point out that no fifteen- or sixteen-year-olds have been executed in over a quarter of a century. The same is also true of seventeen year-olds.[22] Thus, it seems to me that the reasoning in Allen would prevent a seventeen-year-old offender from being executed, despite this Court's ruling in LeCroy to the contrary.
While I agree that juveniles are treated differently under the laws of this state, this protection derives from the statutory law enacted by the legislature, not the Florida Constitution. It seems logical to me, therefore, that the legislature can establish the minimum ages for certain punishments, provided such laws do not run afoul of the federal constitution. See *18 Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (holding that executing a fifteen-year-old offender violates the Eighth Amendment of the federal constitution). Because the court in LeCroy based its decision on legislative history, I find the reasoning of that case more persuasive than Allen. Ever since the legislature began considering the issue, a sixteen-year-old charged with a capital offense was subject to transfer for trial and treatment in every respect as an adult. Therefore, I disagree with the majority that Allen controls this case.
In addition to the legislative history in this state, I am also persuaded by the United State Supreme Court's decision in Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989).[23] In Stanford, the Supreme Court held that it was not cruel and unusual punishment under the Eighth Amendment of the federal constitution to impose the death penalty on an individual who was sixteen or seventeen years of age at the time of the crime. The Court stated that the focus was on the "evolving standards of decency that mark the progress of a maturing society." Id. at 369, 109 S.Ct. 2969 (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). The Court held that it was the sixteen- and seventeen-year-old petitioners' burden to establish a national consensus against imposing the death penalty upon a sixteen- or seventeen-year-old. The Court concluded that based on the pattern of enacted laws, the petitioners failed to carry that burden.[24]
I have researched this issue to determine whether the 1989 figures are still valid today. Upon closer examination, it appears that the current consensus is quite similar to that of 1989. Of the thirty-nine states that permit capital punishment, twenty-four of them permit the death penalty to be imposed on sixteen-year-olds, as compared to twenty-two in 1989.[25] These *19 *20 figures reaffirm the Supreme Court's holding in Stanford that there is no national consensus against executing a sixteen-year-old.
The majority attempts to distinguish Stanford from the present case:
In order for the death penalty to have been constitutionally imposed on a defendant, the Court concluded that one of the "individualized mitigating factors that sentencers must be permitted to consider is the defendant's age." [Stanford, 492 U.S. at 375, 109 S.Ct. 2969.] The majority then observed that "the determinations required by juvenile transfer statutes to certify a juvenile for trial as an adult ensure individualized consideration of the maturity and moral responsibility of 16- and 17-year-old offenders before they are even held to stand trial as adults." Id. (emphasis supplied). The Kentucky and Missouri statutes under consideration in Stanford specifically required a court to give individualized consideration of sixteen and seventeen-year-old juvenile defendants before determining whether they should be transferred from juvenile court to stand trial as adults. 492 U.S. at 377 n. 6[, 109 S.Ct. 2969]. The Kentucky statute additionally specified a minimum age for the death penalty at sixteen. See id.

Unlike the state statutes cited with approval in Stanford, the Florida statute neither sets a minimum age for the death penalty nor sets forth criteria to *21 "ensure individualized consideration of the maturity and moral responsibility," id. at 376, 109 S.Ct. 2969, of those under eighteen before the child can be tried as an adult and sentenced to death. Section 985.225(1)(a), Florida Statutes (1997), provides that a child of any age may be indicted for a capital crime and, when indicted, "must be tried and handled in every respect as an adult ... on the offense punishable by death or by life imprisonment." Section 985.225(3) further provides that "[i]f the child is found to have committed the offense punishable by death or life imprisonment, the child shall be sentenced as an adult."
The Legislature's failure to impose a minimum age, the legislative mandate that a child of any age indicted for a capital crime shall be subject to the death penalty, and the failure to set up a system through our juvenile transfer statutes that "ensure[s] individualized consideration of the maturity and moral responsibility" render our statutory scheme suspect under the federal constitution and the reasoning of Stanford as it applies to sixteen-year-old offenders. 492 U.S. at 375, 109 S.Ct. 2969.
Majority op. at 9.[26]
The majority relies on but a single aspect of Justice Scalia's reasoning. The entire passage states:
The criminal justice system, however, does provide individualized testing. In the realm of capital punishment in particular, "individualized consideration [is] a constitutional requirement," Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978) (opinion of Burger, C.J.) (footnote omitted); see also Zant v. Stephens, 462 U.S. 862, 879, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983) (collecting cases), and one of the individualized mitigating factors that sentencers must be permitted to consider is the defendant's age, see Eddings v. Oklahoma, 455 U.S. 104, 115-116, 102 S.Ct. 869, 877-878, 71 L.Ed.2d 1 (1982). Twenty-nine States, including both Kentucky and Missouri, have codified this constitutional requirement in laws specifically designating the defendant's age as a mitigating factor in capital cases. Moreover, the determinations required by juvenile transfer statutes to certify a juvenile for trial as an adult ensure individualized consideration of the maturity and moral responsibility of 16- and 17-year-old offenders before they are even held to stand trial as adults. The application of this particularized system to the petitioners can be declared constitutionally inadequate only if there is a consensus, not that 17 or 18 is the age at which most persons, or even almost all persons, achieve sufficient maturity to be held fully responsible for murder; but that 17 or 18 is the age before which no one can reasonably be held fully responsible. What displays society's views on this latter point are not the ages set forth in the generalized system of driving, drinking, and voting laws cited by petitioners and their amici, but the ages at which the States permit their particularized capital punishment systems to be applied.
Stanford, 492 U.S. at 374-77, 109 S.Ct. 2969 (footnotes omitted). After considering this passage in context, it is apparent to me that the Supreme Court was concerned with the general concept of individualized testing for maturity and moral responsibility. The juvenile transfer statutes *22 of Kentucky and Mississippi were just examples of this, as was the age mitigating circumstance. Neither were strict requirements or prerequisites. In Florida, although we no longer give the trial judge discretion for juvenile transfers in capital cases, we do permit the defendant to introduce statutory and nonstatutory mitigating circumstances during the penalty phase. The legislature has designated age as a statutory mitigating circumstance. See § 921.141(6)(g), Fla. Stat. (1995). Thus, a defendant's age is an important consideration, especially if that defendant is sixteen. Both the jury and the judge are asked to consider and weigh this mitigator before rendering a decision on the appropriate punishment. In my opinion, the age mitigator satisfies Justice Scalia's concerns regarding individualized testing.
Mississippi's juvenile transfer statute is similar to Florida's. In Holly v. State, 671 So.2d 32, 42 (Miss.1996), cert. denied, 525 U.S. 1107, 119 S.Ct. 877, 142 L.Ed.2d 777 (1999), the Mississippi Supreme Court addressed a similar argument, stating:
Holly further asserts that pursuant to Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), since no particularized findings as to his maturity and moral responsibility were made, his conviction must be set aside. Stanford imposes no such responsibility upon states. Rather, in dicta, the Supreme Court merely noted that "the determinations required by juvenile transfer statutes to certify a juvenile for trial as an adult ensure individualized consideration of the maturity and moral responsibility of 16- and 17-year-old offenders before they are even held to stand trial as adults." Stanford, 492 U.S. at 375, 109 S.Ct. at 2978, 106 L.Ed.2d at 322. There being no constitutional impediments to the imposition of the death penalty on a juvenile offender who was seventeen years old at the time of the crimes for which he was convicted, we find no merit to Holly's arguments.
(Emphasis supplied.)
For all of these reasons, I would affirm the convictions and sentences in this case, including the sentence of death.
WELLS, J., and OVERTON, Senior Justice, concur.
WELLS, J., concurring in part and dissenting in part.
I concur in the affirmance of guilt.
I join in Chief Justice Harding's dissent as to Brennan's sentence. I write separately to point out that it is my view that to state that Allen v. State, 636 So.2d 494 (Fla.1994), is precedent for the majority's decision is clearly wrong and abuses the doctrine of stare decisis. At most,[27]Allen is precedent for a person under sixteen not being death-eligible. This defendant was eight days shy of seventeen. If there is controlling precedent on the issue of whether this defendant was death-eligible, it is LeCroy v. State, 533 So.2d 750 (Fla. 1988), in which this Court upheld the death penalty for a person who was seventeen. LeCroy's death sentence has recently been affirmed. LeCroy v. Dugger, 727 So.2d 236 (Fla.1998). Thus, rather than adhering to stare decisis, the majority, in reality, casts it aside, as evidenced by the concurring opinion's reliance on Justice Barkett's dissent in LeCroy.
Obviously, we all agree with the sentiments concerning valuing children. However, I strongly disagree with wrapping this decision in those sentiments and using that wrapping as a basis for this Court to disregard the discipline which the Court has a responsibility to exercise in respecting the doctrine of separation of powers which is essential to our form of government.
In recognizing that the death penalty is constitutional we necessarily have recognized *23 that whether to have the death penalty is a legislative decision, as are all criminal sentences. Booker v. State, 514 So.2d 1079, 1081 (Fla.1987); State v. Dixon, 283 So.2d 1 (Fla.1973); Brown v. State, 152 Fla. 853, 13 So.2d 458 (1943). In Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), the Supreme Court appropriately pointed out that "[w]hatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility, these are peculiarly questions of legislative policy." Id. at 393, 78 S.Ct. 1280 (citation omitted). This is a sensible rule since it is the people who are imposing the punishment, and it is the people through their elected representatives who decide the punishment. Opponents of this view contend that this subjects these decisions to political pressures, but it appears to me that it is what a representative democracy is all about.
The majority states that it has "great respect for the legislative voice" but, by a majority of one, designates this particular sentencing decision to be "constitutional," not legislative. I conclude that this insufficiently respects the "authority" of the legislature and assumes too much authority by a transient majority of one on this Court. Chief Justice Harding cogently sets out in his opinion the many other states which defer to the legislature in making this sentencing decision. According to his research, in only one other state (Washington) has the state supreme court made this decision, and in that state, the decision was made on the basis that its particular statutes would not comply with Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), if applied to juveniles under the age of eighteen. See State v. Furman, 122 Wash.2d 440, 858 P.2d 1092, 1102 (1993). There is simply no sound basis for this Court to take this lone position.
The defendant in this case did not commit a child-like crime. His codefendant, Joshua D. Nelson, who was eighteen at the time of this murder, was also sentenced to death. That sentence has been affirmed by this Court. Nelson v. State, 748 So.2d 237 (Fla.1999). In the sentencing order, the trial judge, in finding this murder to be heinous, atrocious, or cruel, stated:
The victim in this case was lured under false pretenses to a remote section of Cape Coral, Lee County, Florida. The victim was told by defendant KEITH BRENNAN and co-defendant Nelson they were to meet a friend who owed them money. Defendant KEITH BRENNAN was armed with a box cutter and both defendant, KEITH BRENNAN and co-defendant Josh Nelson, knew from prior experience that the victim, Thomas Owens, carried a metal baseball bat in the back seat of his car. The evidence adduced at trial revealed that defendant KEITH BRENNAN and co-defendant, Josh Nelson had difficulty getting the victim, Thomas Owens, out of his car. As a subterfuge, defendant, KEITH BRENNAN, left the car and cut the rear bumper with his box cutter and then told Owens about the damage to his car. When victim Owens got out to look at the damage he was then struck by co-defendant Joshua Nelson with the bat. The victim ran and was chased down by co-defendant Joshua Nelson with Defendant KEITH BRENNAN not far behind. Victim Owens finding himself injured and in pain offered his car and money to KEITH BRENNAN and Joshua Nelson and to make up a story about its disappearance if he should not be hit again. Defendant KEITH BRENNAN and co-defendant Joshua Nelson then decided if they allowed victim Owens to live, they would be discovered. The victim Owens was struck again by co-defendant Joshua Nelson, in order that defendant KEITH BRENNAN could cut the victim's throat. In his confession, Defendant KEITH BRENNAN described in detail how he had trouble cutting the victim's throat and repeatedly slashed and cut Owen's throat with the box cutter several *24 times. Even after this gruesome procedure, defendant KEITH BRENNAN described how the victim was still breathing, and at that time he was struck again by the co-defendant Joshua Nelson with the baseball bat. This ordeal lasted over an undetermined period of time where the victim suffered multiple blows to the head. The evidence shows he was at times conscious and aware of his ultimate demise before his throat was cut. This was a malevolent, unmerciful and ruthless murder involving prolonged torture and unmitigated cruelty. Since these facts were admitted by the Defendant and the facts fully support his admission, the aggravating factor that this murder was especially heinous, atrocious, or cruel has been proved beyond a reasonable doubt.
In finding this murder to be committed in a cold, calculated, and premeditated manner and without any pretense of any moral or legal justification, the trial judge found:
The Defendant in this case, along with the co-defendant, planned in advance to lure the victim to a remote place in Cape Coral, Lee County, Florida, for the purpose of killing him and then stealing his car. The defendant, KEITH BRENNAN, in his statement discussed how he and his co-defendant, Joshua Nelson, discussed methods which the victim might be enticed to leave his vehicle. The defendant, KEITH BRENNAN, described how he went to the back of the car and made a cut or scratch, knowing the victim would come out to look because of how well he cared for the car.
When the victim got out to look at the damage, he was hit by co-defendant Joshua Nelson. The victim then tried to flee. He was chased down by both defendant KEITH BRENNAN and co-defendant Joshua Nelson. The victim pleaded for them to take his car and leave him alone. The defendant KEITH BRENNAN and co-defendant Joshua Nelson decided the victim should die. The victim was then beaten by both defendant KEITH BRENNAN and codefendant Joshua Nelson. The victim's throat was cut by defendant KEITH BRENNAN. The victim's hands were bound by defendant KEITH BRENNAN and together they dragged Owens along the ground into the brush where he was again beaten by both defendant KEITH BRENNAN and co-defendant Joshua Nelson and left to die after being covered by a piece of plywood.
These actions were the product of calm and cool reflection and were not prompted by emotional frenzy, panic, or a fit of rage.
The death of victim Thomas Owens was the result of a careful plan made well in advance of the commission of the offense thus indicating a premeditation.
Since these facts were all admitted by the Defendant, and the evidence fully supports his admission, the aggravating factor that the capital felony for which the Defendant is to be sentenced was committed in a cold and calculated and premeditated manner without any pretense or moral or legal justification has been proved beyond a reasonable doubt.
In respect to whether defendant's participation was relatively minor, the trial judge said:
The evidence in this case was that it was the defendant, KEITH BRENNAN, and co-defendant, Joshua Nelson, who discussed the plan to murder the victim and take his car and money the day before it occurred. It was defendant KEITH BRENNAN who lured the victim out of his car by cutting or scratching the car with the box cutter he carried. It was the defendant KEITH BRENNAN who used the box cutter he carried to repeatedly cut the throat of the victim. It was the defendant KEITH BRENNAN who tied the victim's hands behind his back. It was the defendant KEITH BRENNAN who helped the co-defendant Joshua Nelson drag the victim into the brush where they both struck the victim again with *25 the baseball bat. It was the defendant KEITH BRENNAN and co-defendant Joshua Nelson who covered the body with a piece of plywood and left the victim gasping and gurgling to die. Both defendant KEITH BRENNAN and co-defendant Joshua Nelson are equally culpable in the death of the victim Thomas Owens.
If an arbitrary line is to be drawn in this case between defendant Brennan, being one week shy of seventeen, and the defendant Nelson, being eighteen, it cannot be based upon this Court's precedent or upon the Constitution. It has to be drawn by the people of this state through their elected representatives in the legislature. The legislature has not so limited the death penalty, and this Court should defer to that legislative decision not to make a person of defendant's age per se ineligible for a death sentence.
NOTES
[1] Although finding that the murder was cold and calculated, the trial court found and gave "some weight" to the fact that victim had committed sexual battery on Brennan's girlfriend, thus evidencing "emotional reasons" for the crime.
[2] The following nonstatutory mitigators were presented during the penalty phase (weight assigned to each in parentheses): (1) Brennan offered to plead to the charges in return for a life sentence (some weight), (2) proportionality (some weight), (3) Brennan's mother committed suicide when he was two years old (little weight), (4) positive personality traits, rehabilitation potential (not established), (5) relative involvement (little weight), (6) character as testified to by members of his family (not established), (7) drug abuse problems (moderate weight), (8) sexually abused as a child by his older brother (little weight), (9) difficult childhood (little weight), (10) Brennan's behavior at trial was acceptable (some weight), (11) dysfunctional family (little weight), (12) gave a voluntary statement following arrest (some weight), (13) using LSD the night before the homicide was committed (moderate weight), (14) apprehension, perceived his own demise at the hands of Nelson if he did not follow his instructions (little weight), (15) completed Southwest Florida Addiction Services program (not established), (16) influence of the older Nelson in the offense (little weight), (17) alcohol abuse (moderate weight), (18) not known, prior to this case, to be a violent person (some weight), (19) personality disorder (some weight), (20) childhood trauma (little weight), (21) psychological stress (some weight), (22) questions regarding roles of Brennan and Nelson (little weight), (23) above average intelligence (not established), (24) step-mother testified he was a good son (little weight), (25) victim had committed sexual battery on the girlfriend of Brennan, Tina Porth (some weight), (26) lack of childhood development, small in stature, taken advantage by others (little weight), (27) emotional reasons for crime rather than cold calculation (some weight), (28) very young, sixteen years of age at time of killing (some weight), and (29) was a follower rather than a leader (little weight).
[3] (1) the trial court erred by giving a vague jury instruction on HAC; (2) the trial court permitted the State to introduce evidence at the Spencer hearing in violation of discovery principles; (3) the trial court erred by weighing HAC; (4) the trial court determined that HAC existed through a process of improper doubling; (5) the trial court erred by weighing CCP; (6) the trial court erred by weighing the avoidance of arrest aggravator; (7) the court erred by weighing the during the commission of a robbery aggravator; (8) it is cruel and unusual punishment to impose the death penalty on a sixteen-year-old; and (9) the death penalty is disproportionate.
[4] In its motion for rehearing, the State contends for the first time in this appeal that this Court must construe article I, section 17 consistent with the amendment to that section approved on November 3, 1998. That amendment changes the language of the constitutional prohibition from "cruel or unusual" to "cruel and unusual," mandates that this prohibition "shall be construed in conformity with the United States Supreme Court" precedent and provides that the section applies retroactively. Motions for rehearing may only be used to apprise a court of "the points of law or fact that the court has overlooked or misapprehended." Fla.R.App.P. 9.330(a). This argument is an entirely new issue neither raised nor briefed on appeal. See Polyglycoat Corp. v. Hirsch Distributors Inc., 442 So.2d 958, 960 (Fla.4th DCA 1983). Further, this Court is presently considering the validity of this amendment in Armstrong v. Harris, No. 95,223 (Fla. certificate filed March 31, 1999), which was orally argued before the Court on September 2, 1999. Lastly, we have serious questions whether an amendment, which would adversely affect the substantive law in effect at the time of the original crime, could be applied retroactively without violating the United States Constitution's prohibition against ex post facto laws. See, e.g., Gwong v. Singletary, 683 So.2d 109, 112 (Fla.1996); State v. Lavazzoli, 434 So.2d 321, 323 (Fla.1983).
[5] The majority in Thompson v. Oklahoma, 487 U.S. 815, 838, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), refused to "draw a line" that would prohibit the execution of any person under the age of eighteen. However, as Justice O'Connor noted in her special concurrence, every member of the United States Supreme Court participating in Thompson agreed that "there is some age below which a juvenile's crimes can never be constitutionally punished by death." Id. at 848, 108 S.Ct. 2687 (O'Connor, J., concurring in the judgment).
[6] The State points out on rehearing that a death sentence has also been imposed for the murder conviction of Roderrick Ferrell, who was sixteen at the time of the crime. That case has not yet been considered by this Court. See Ferrell v. State, No.93,127 (Fla. notice of appeal filed June 2, 1998).
[7] In Farina v. State, 680 So.2d 392, 399 (Fla. 1996), we reversed the imposition of the death penalty on other grounds and declined to reach the constitutionality of executing defendants who were sixteen at the time of the crime. The death penalty was reimposed on Farina on remand, but that case has not yet been considered by this Court. See Farina v. State, No. 93,907 (Fla.notice of appeal filed Sept. 14, 1998).
[8] After the death penalty was imposed during the first trial and two retrials, Morgan's death penalty was ultimately reduced to life imprisonment. See Morgan v. State, 639 So.2d 6, 9 (Fla.1994); Morgan v. State, 537 So.2d 973, 974 (Fla.1989); Morgan v. State, 453 So.2d 394, 395 (Fla.1984); Morgan v. State, 392 So.2d 1315, 1316 n. 1 (Fla.1981).
[9] Only four members of the nine-person United States Supreme Court agreed with all parts of Justice Scalia's five-part opinion in See Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989); thus, the opinion is described as a plurality opinion. Part I of Stanford described the procedural history of the case. Part II enunciated the standard for determining whether the punishment in question violated the Eighth Amendment. Part III held that the petitioners had failed to meet their burden of establishing that there was a national consensus against executing sixteen and seventeen-year-olds. Part IV-A dismissed as unpersuasive the fact that few offenders under eighteen had been sentenced to death. Part IV-B rejected the proposition that general age-based state statutory schemes are relevant to the issue. Part V declined to consider public opinion polls and socioscientific evidence regarding the lack of deterrent effect of such a punishment on sixteen and seventeen-year olds. Chief Justice Rehnquist and Justices White, O'Connor, and Kennedy concurred as to Parts I, II, III, and IV-A. Chief Justice Rehnquist and Justices White and Kennedy also concurred as to Parts IV-B and V.

Justice O'Connor concurred in part but disagreed with Part IV-B and V, authoring a separate concurring opinion. See id. at 380-82, 109 S.Ct. 2969. Justice Brennan authored a dissent in which Justices Marshall, Blackmun, and Stevens joined, using the same reasoning employed by Justice Stevens in the majority opinion in Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), holding that it is unconstitutional to execute defendants who were fifteen at the time of the crime. See id. at 382-405, 109 S.Ct. 2969 (Brennan, J., dissenting).
[10] The plurality in Stanford limited its focus to "American conceptions of decency that are dispositive" for the purpose of establishing the "first Eighth Amendment prerequisite, that the practice is accepted among our people." 492 U.S. at 369 n. 1, 109 S.Ct. 2969. The dissent surveyed the position of the American Bar Association and other national and international organizations. See id. at 388, 109 S.Ct. 2969 (Brennan, J., dissenting). It noted that over 50 countries, including nearly all in Western Europe, have formally abolished the death penalty or have limited its use to exceptional crimes such as treason. See id. at 389, 109 S.Ct. 2969. Of the nations that retain capital punishment, 65 prohibit the execution of juveniles. See id. At the time of the Stanford decision, only eight executions of juveniles had been recorded since 1979, with three of these taking place in the United States and the remaining five in Pakistan, Bangladesh, Rwanda, and Barbados. See id.
[11] In the Stanford plurality opinion, Part IV-B rejected the argument that state laws setting eighteen as the legal age for engaging in various activities were relevant to whether a state is prohibited by the United States Constitution from executing an individual under eighteen. 492 U.S. at 374-75, 109 S.Ct. 2969. On the other hand, in Thompson v. Oklahoma, the plurality opinion found legislative enactments, including statutes setting forth the rights and duties of children as compared to adults, to be relevant in Eighth Amendment analysis. 487 U.S. at 822-23, 108 S.Ct. 2687. The only way to understand this reversal in reasoning is to consider the author of each opinion. Justice Scalia, who dissented in Thompson, wrote the majority in Stanford. Justice O'Connor was the swing vote in each case but never fully espoused the author's reasoning in either. In Stanford, she specifically identified "age-based statutory classifications as `relevant to the Eighth Amendment proportionality analysis.'" 492 U.S. at 382, 109 S.Ct. 2969 (O'Connor, J., concurring in part). In Justice O'Connor's opinion, the Court's constitutional analysis should include consideration of "state statutes that distinguish juveniles from adults for a variety of other purposes." Id.
[12] See Ex Parte Hart, 612 So.2d 536 (Ala. 1992); State v. Jackson, 186 Ariz. 20, 918 P.2d 1038 (1996); Domingues v. State, 114 Nev. 783, 961 P.2d 1279 (1998), petition for cert. filed, No. 98-8327 (U.S. Mar. 1, 1999); State v. Conyers, 326 S.C. 263, 487 S.E.2d 181 (1997); Jackson v. Commonwealth, 255 Va. 625, 499 S.E.2d 538 (1998), cert. denied, 525 U.S. 1067, 119 S.Ct. 796, 142 L.Ed.2d 658 (1999). In Jackson, the Arizona Supreme Court relied on the United States Supreme Court decision in Stanford, noting that their state constitutional prohibition against cruel and unusual punishment was identical to the Eighth Amendment of the United States Constitution, and that no party had argued for a different interpretation. Jackson, 918 P.2d at 1043. In Conyers, the South Carolina Supreme Court held that the issue had not been preserved, and also relied on Stanford without any analysis under its state constitution. Conyers, 487 S.E.2d at 183. In its decision, the Virginia Supreme Court noted that its juvenile transfer statute, which only allowed transfer of juveniles over fourteen, provided as much detail as the similar statutes upheld in Stanford. See Jackson, 499 S.E.2d at 552. In Ex Parte Hart, 612 So.2d at 537, the Alabama Supreme Court affirmed the court of appeals' conclusion, without discussion, that the imposition of the death penalty on a defendant sixteen at the time of the crime is constitutional. See Hart v. State, 612 So.2d 520, 535 (Ala.Crim.App.1992). Finally, in Domingues, the Nevada Supreme Court dealt with and rejected the "single issue" of whether Nevada's death penalty statute was "Superseded by an international treaty ratified by the United States, which prohibits the execution of individuals who committed capital offenses while under the age of eighteen." 961 P.2d at 1279.
[13] The Washington state statute, like Florida's statute, did not impose a minimum age on transfer. However, unlike Florida's statute, the Washington statute did impose transfer criteria. See State v. Furman, 858 P.2d at 1102. The Washington Supreme Court reasoned that it

[could not] rewrite the juvenile court statute or the death penalty statute to expressly preclude imposition of the death penalty for crimes committed by persons who are under age 16 and thus exempt from the death penalty under Thompson. Nor is there any provision in either statute that could be severed in order to achieve that result. The statutes therefore cannot be construed to authorize imposition of the death penalty for crimes committed by juveniles. Absent such authorization, appellant's death sentence cannot stand.
Id. at 1103 (footnote omitted). We decline to follow this reasoning in deciding the constitutionality of Florida's death penalty.
[14] In another death penalty case, Justice Wells has recently commented: "If the doctrine of stare decisis has any efficacy under our case law, death penalty jurisprudence cries out for its application." Blanco v. State, 706 So.2d 7, 12 (Fla.1997) (Wells, J., concurring). The importance of precedence and the concept of stare decisis are, of course, sometimes in the eye of the beholder. Put another way, their invocation may sometimes rest on whether they support an outcome arrived at by a separate route. That is reality.
[15] Someone must draw these important lines, and in our unique framework of sharing governmental powers, this function of constitutional line-drawing has been assigned to the judicial branch. See Thompson v. Oklahoma, 487 U.S. 815, 840, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (O'Connor, J., concurring in judgment) ("[T]here is some age below which a juvenile's crimes can never be constitutionally punished by death...."). While there may be good faith disagreements over where a particular line is to be drawn, when all is said and done we must accept that unique responsibility and do the best we can. Further, no matter where we draw that line, and, no matter the rationale, there will always appear to be a degree of arbitrariness in its selection. Inevitably, there will be cases where one day's difference in age will be the determinative factor between life and death. We must also remember that the line we draw today only prevents the State from killing a child, but does not prevent the State from protecting society and punishing the child offender by imprisoning the child for life, a punishment many view as equivalent to a sentence of death.
[16] My views are not new. In fact, they are consistent with those of Justice Barkett as set out in her separate opinion in LeCroy v. State, 533 So.2d 750 (Fla.1988):

I am confident that most reasonable persons would agree that the death penalty cannot be imposed on children below a certain age. As Justice O'Connor noted, every member of the United States Supreme Court participating in the Thompson decision agreed that "there is some age below which a juvenile's crimes can never be constitutionally punished by death." 108 S.Ct. at 2706. Differences arise only as to the age which should be the line of demarcation. In my view, that line should be drawn where the law otherwise distinguishes "minors" from adults. In Florida, this defendant would fall below that line.
Florida law protects seventeen-year-olds and those who are younger, treating them as "minors" and "children," see sections 1.01(14), 39.01(7), Florida Statutes (1987), not as mature adults capable of exercising judgment or discretion. For example, an unmarried seventeen-year-old such as appellant cannot vote, § 97.041, Fla. Stat. (1987), serve on a jury, § 40.01, Fla. Stat. (1987), or purchase or possess alcoholic beverages, § 562.11, Fla. Stat. (1987). Nor may he or she attend jai alai or a dog race, compare § 550.04 with § 551.03, Fla. Stat. (1987), dispose of property by will, § 732.501, Fla. Stat. (1987), enter into a contract, compare § 743.01 with § 743.07, Fla. Stat. (1987), or sue or be sued. Compare § 743.01 with § 743.07, Fla. Stat. (1987). Without parental consent a seventeen-year-old may not marry, § 741.0405, Fla. Stat. (1987), and without either parental or judicial consent, a seventeen-year-old may not obtain an abortion. § 390.001(4)(a), Fla. Stat. (1987).
When a government withholds the right of a citizen to enjoy certain benefits and privileges because of immaturity and lack of judgment, then for the same reason it also should withhold the imposition of the ultimate and final penalty, which can be imposed only where there is heightened culpability. I cannot agree, as the majority implicitly holds, that one whose maturity is deemed legally insufficient in other respects should be considered mature enough to be executed in the electric chair.
Id. at 759 (Barkett, J., concurring in part, dissenting in part).
[17] See note 16, supra, for some examples cited by Justice Barkett.
[18] The United States, for example, is a party to the International Covenant on Civil and Political Rights which bans the use of the death penalty for children under age eighteen. Nearly every country in the world, including those like China whose human rights practices we sometimes question, honor that ban.
[19] Stanford v. Kentucky, 492 U.S. 361, 369, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).
[20] The opinion in LeCroy couched the argument as "cruel and unusual" rather than "cruel or unusual." LeCroy v. State, 533 So.2d 750, 756 (Fla.1988).
[21] The court in LeCroy correctly pointed out that the Florida Constitution did not authorize the legislature to confer criminal jurisdiction on cases involving juveniles in juvenile courts until 1950. However, it is important to note that juvenile courts existed in Florida as early as 1911. See Roger J. Waybright, A Proposed Juvenile Court Act For Florida, 4 U. Fla. L.Rev. 16, 20 (1951). Some of these early juvenile courts were established by special acts of the legislature, while others were created as a result of chapter 6216, Laws of Florida, which placed a duty upon county judges to exercise control over dependent and delinquent children. See id. However, because these courts were limited in their jurisdiction, the courts were confined to dealing with cases involving minor crimes or neglected children. See id. at 20-21.
[22] In fact, since the death penalty was reinstated in 1976, no person under the age of twenty has been executed. See Florida Department of Corrections, Execution List (last modified Dec. 28, 1998) .
[23] On November 3, 1998, 72% of those who voted approved Amendment 2 to article I, section 17 of the Florida Constitution. See Jeff Kunerth, Voters of for most revisions on the ballot, Orlando Sent., Nov. 4, 1998, at D1, D4. Although I decline to pass judgment on the validity of Amendment 2, I point out that Amendment 2 requires that the Florida Constitution's prohibition against "cruel or unusual punishment" be interpreted in conformity with decisions of the United States Supreme Court. See amend. 2 (1998) (proposed amendment to art. I, § 17, Fla. Const.).
[24] The majority reasoned that of the thirty-seven states that permit capital punishment, fifteen states decline to impose it on sixteen-year-olds and twelve states decline to impose it on seventeen-year-olds. Stanford v. Kentucky, 492 U.S. 361, 370, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). The Court concluded that "a majority of the states that permit capital punishment authorize it for crimes committed at age 16 or above." Id. at 371, 109 S.Ct. 2969.
[25] Since the Supreme Court compiled its research in 1989, the following changes have occurred: Kansas and New York have enacted laws enabling capital punishment but setting a minimum age at eighteen; Georgia and Texas moved from a minimum age of seventeen to now having no minimum age; and the Supreme Court of Washington has held that juveniles (persons under the age of eighteen) cannot be sentenced to death, despite the fact that the state's statutory scheme would permit sixteen- and seventeen-year-olds to be sentenced to death. As of today, thirty-nine states permit capital punishment. Including Florida, nineteen states have no express minimum: Alabama (see Ala.Code §§ 13A-6-2, 13A-5-39-59 (1994); see also Ala.Code § 12-15-34, 12-15-34.1 (Supp.1998) (allowing transfer of a fourteen-year-old charged with a capital offense to criminal court; requiring transfer of a sixteen-year-old charged with a capital offense to criminal court; and requiring that any juvenile accused of a capital crime and transferred to criminal court be sentenced as an adult)); Arizona (see Ariz. Rev.Stat. Ann. § 13-1105 (West Supp.1998); see also Ariz.Rev.Stat. Ann. § 13-501 (West Supp.1998) (requiring transfer of fifteen-year-old juvenile charged with first-degree murder to criminal court)); Arkansas (see Ark.Code Ann. § 5-4-104, 5-10-101 (Michie 1997); see also Ark.Code Ann. § 9-27-318(b) (Michie 1998) (allowing transfer of a fourteen-year-old charged with capital murder to criminal court)); Delaware (see Del.Code Ann. tit. 11, §§ 636, 4209 (1995); see also Del.Code Ann. tit. 10, § 1010 (Supp.1998))(allowing transfer to criminal court of a fifteen-year-old juvenile accused of a felony if that juvenile is an escapee from a juvenile detention facility); Florida (see § 775.082(1), Fla. Stat. (1997); see also § 985.225, Fla. Stat. (1997)); Georgia (see Ga.Code Ann. § 16-5-1 (1996); see also Ga. Code Ann. § 15-11-5(b)(2) (Supp.1998) (requiring transfer of thirteen-year-old juveniles charged with murder to criminal court)); Idaho (see Idaho Code § 18-4004 (Supp.1998); see also Idaho Code § 20-509 (1997) (allowing transfer of any child charged with murder of any degree to criminal court)); Kentucky (see Ky.Rev.Stat. Ann. § 507.020 (Michie 1990); see also Ky.Rev.Stat. Ann. §§ 635.020, 640.010 (Michie Supp.1998) (allowing transfer of fourteen-year-old juveniles charged with capital murder to criminal court)); Louisiana (see La.Rev.Stat. Ann. § 14:30 (West 1997); see also La. Children's Code Art. 305 (West 1999) (allowing transfer of fifteen-year-old juveniles charged with first-degree murder to criminal court)); Mississippi (see Miss.Code Ann. § 97-3-21 (1994); see also Miss.Code Ann. § 43-21-151 (1999) (requiring transfer of thirteen-year-old juveniles charged with a capital offense to criminal court)); Montana (see Mont.Code Ann. § 45-5-102 (1997); see also Mont.Code Ann. § 41-5-206 (1997) (allowing transfer of twelve-year-old juveniles charged with deliberate homicide to criminal court)); Oklahoma (see Okla. Stat. tit. 21, § 701.9 (Supp.1998); see also Okla. Stat. tit. 10, § 7306-1.1 (Supp.1998) (requiring transfer of a thirteen-year-old juvenile charged with first-degree murder to criminal court)); Pennsylvania (see 18 Pa. Cons.Stat. Ann. § 1102 (West 1998); see also 42 Pa. Cons. Stat. Ann. § 6355 (West Supp.1999) (when appropriate, permitting the transfer of a fourteen-year-old juvenile charged with murder to criminal court)); South Carolina (see S.C.Code Ann. § 16-3-20 (Law Co-op Supp. 1998); see also S.C.Code Ann. § 20-7-7605 (Law Co-op Supp.1998) (allowing transfer to criminal court of a fourteen-year-old juvenile charged with a felony which provides a maximum term of imprisonment of fifteen years or more)); South Dakota (see S.D. Codified Laws §§ 22-6-1, 22-16-12 (Michie 1998); see also S.D. Codified Laws § 26-11-3.1 (Michie 1999) (requiring transfer of sixteen-year-old juveniles charged with a capital (class A) felony to criminal court and allowing the juvenile to rebut the presumption that such transfer is in the public's best interest)); Texas (see Tex. Penal Code Ann. § 12.31(West 1994); see also Tex. Fam.Code Ann. § 54.02 (West 1996) (allowing transfer of fourteen-year-old juveniles charged with a capital offense to criminal court)); Utah (see Utah Code Ann. § 76-3-206 (1995), § 76-5-202 (Supp.1998); see also Utah Code Ann. § 78-3a-601 (Supp.1998) (requiring transfer of sixteen-year-old juveniles charged with aggravated murder to criminal court)); Vermont (see Vt. Stat. Ann. tit. 13, § 3484 (1998)) (concerted action by three or more provides death penalty for certain offenses committed in wartime); Vt. Stat. Ann. tit.33, § 5502 (Supp.1998) (juvenile, in a criminal context, defined as someone under the age of sixteen); and Virginia (see Va.Code Ann. § 18.2-31 (Michie Supp.1999), § 18.2-10 (Michie 1996); see also Va.Code Ann. § 16.1-269.1 (Michie 1996) (allowing transfer of fourteen-year-old juveniles charged with capital murder to criminal court)).

Of the preceding states, the highest courts in Alabama, Arizona, South Carolina, and Virginia have upheld cases where sixteen-year-old defendants had been sentenced to death. See Ex Parte Hart, 612 So.2d 536 (Ala.1992); State v. Jackson, 186 Ariz. 20, 918 P.2d 1038 (1996); State v. Conyers, 326 S.C. 263, 487 S.E.2d 181 (1997); Jackson v. Commonwealth, 255 Va. 625, 499 S.E.2d 538 (1998).
Vermont no longer permits capital punishment for the crime of murder. See Vt. Stat. Ann., Tit. 13, § 2303 (1998). However, the state still permits capital punishment for the crime of "concerted action by three or more." See Vt. Stat. Ann., Tit. 13, § 3484 (1998). In addition, persons sixteen years of age and older are considered adults under Vermont criminal law. See Vt. Stat. Ann., Tit. 33, § 5502 (Supp.1998). Conceivably, a sixteen-year-old charged with "concerted action by three or more" could receive the death penalty. Therefore, we have included Vermont among those states that permit the death penalty for sixteen-year-olds. We recognize that Justice Brennan reached a different conclusion regarding Vermont's death penalty, wherein he stated:
The 15th State to have rejected capital punishment altogether is Vermont. Vermont repealed a statute that had allowed capital punishment for some murders. See Vt. Stat.Ann., Tit. 13, § 2303 (1974 and Supp. 1988). The State now provides for the death penalty only for kidnaping with intent to extort money. § 2403. Insofar as it permits a sentence of death, § 2403 was rendered unconstitutional by our decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), because Vermont's sentencing scheme does not guide jury discretion, see Vt.Stat.Ann., Tit. 13, §§ 7101-7107 (1974). Vermont's decision not to amend its only law allowing the death penalty in light of Furman and its progeny, in combination with its repeal of its statute permitting capital punishment for murder, leads to the conclusion that the State rejects capital punishment.
Stanford, 492 U.S. at 384, n. 1, 109 S.Ct. 2969 (Brennan, J. dissenting).
Four states expressly set sixteen as the minimum age for capital punishment: Indiana (see Ind.Code Ann. § 35-50-2-3 (West 1998)); Missouri (see Mo.Rev.Stat. Ann. § 565.020 (West 1999)); Nevada (see Nev.Rev.Stat. § 176.025 (1997)); and Wyoming (see Wyo. Stat. Ann. § 6-2-101 (1999)). In Domingues v. State, 114 Nev. 783, 961 P.2d 1279 (1998), the Supreme Court of Nevada affirmed a death sentence for a defendant who was sixteen at the time of the murder.
North Carolina generally precludes capital punishment of offenders under the age of seventeen. See N.C. Gen.Stat. § 14-17 (1993). However, if a defendant under the age of seventeen commits murder while serving a prison sentence for murder or as an escapee from prison pursuant to a murder conviction, that defendant may be sentenced to death. See id. Thus, a sixteen-year-old could conceivably receive the death penalty.
One state precludes capital punishment of offenders under seventeen: New Hampshire (see N.H.Rev.Stat. Ann. § 630:1 (1996)).
Thirteen states preclude capital punishment of offenders under eighteen: California (see Cal.Penal Code § 190.5 (West 1999)); Colorado (see Colo.Rev.Stat. Ann. § 16-11-103 (West Supp.1998)); Connecticut (see Conn. Gen.Stat. § 53a-46a (Supp.1999)); Illinois (see 720 Ill. Comp. Stat. Ann. 5/9-1 (West Supp.1999)); Kansas (see Kans. Stat. Ann. §§ 22-4001-4016, 21-4622 (Supp.1998)); Maryland (see Md.Code Ann. art. 27, § 412 (Supp.1998)); Massachusetts (see Mass. Gen. Laws Ann. ch. 265, § 2 (West 1990)); Nebraska (see Neb.Rev.Stat. § 28-105.01 (Supp. 1998)); New Jersey (see N.J. Stat. Ann. §§ 2C:11-3(g), 2A:4A-22 (West Supp.1999)); New Mexico (see N.M. Stat. Ann. § 31-18-14 (1994), § 12-2A-3 (Michie Supp.1998)); New York (see N.Y. Penal Law § 125.27 (McKinney 1998)); Ohio (see Ohio Rev.Code Ann. § 2929.02 (Anderson 1996)); Oregon (see Or. Rev.Stat. § 137.707 (1997)); and Tennessee (see Tenn.Code Ann. §§ 37-1-134, 37-1-102 (Supp.1998)). In addition, although the statutory scheme in Washington would permit a sixteen-year-old to be sentenced to death (see Wash. Rev.Code § 10.95.030(2) (1998); Wash. Rev.Code § 13.40.110 (1998)), the Supreme Court of Washington has held that no juveniles (persons under the age of eighteen) can be sentenced to death. See State v. Furman, 122 Wash.2d 440, 858 P.2d 1092 (1993).
The following ten states, including the District of Columbia, do not permit capital punishment: Alaska (see Alaska Stat. § 12.55.125 (Michie 1998)); District of Columbia (see D.C.Code Ann. § 22-2404 (Supp.1999)); Hawaii (see Haw.Rev.Stat. § 706-656 (Supp. 1998)); Iowa (see Iowa Code §§ 902.1, 707.2 (1999)); Maine (see Me.Rev.Stat. Ann. tit. 17A, § 1251 (1998)); Michigan (see Mich. Comp. Laws Ann. § 750.316 (West 1999)); Minnesota (see Minn.Stat. §§ 609.10, 609.185 (1998)); North Dakota (see N.D. Cent.Code §§ 12.1-16-01, 12.1-32-01 (1997)); Rhode Island (see R.I. Gen. Laws §§ 11-23-1, 11-23-2 (Supp.1998)); West Virginia (W. Va. Code §§ 61-11-2 (1997)); and Wisconsin (see Wis. Stat. Ann. §§ 939.50, 940.01 (West 1998)).
The statutory scheme in Massachusetts establishes the death penalty as a possible punishment for murder, but precludes capital punishment of offenders under eighteen. See mass. Gen. Laws Ann. ch. 265, § 2 (West 1990). However, the Supreme Judicial Court of Massachusetts has concluded that the death penalty statute violates the state constitution, See Commonwealth v. Colon-Cruz, 393 Mass. 150, 470 N.E.2d 116 (1984).
[26] The majority states that "the failure to set up a system through our juvenile transfer statutes that `ensure[s] individualized consideration of the maturity and moral responsibility' render [Florida's] statutory scheme suspect under the federal constitution and the reasoning of Stanford as it applies to sixteen-year-old offenders." Majority op. at 9. It seems to me that the majority's reasoning would apply regardless of whether the juvenile defendant was sentenced to death or life imprisonment, or any adult sentence for that matter. I hope the majority is not suggesting that the absence of a juvenile transfer statute renders all sentences imposed outside of the juvenile court system invalid.
[27] I think it should be noted that with Chief Judge Harding's present concurring opinion, the reasoning of Allen only rests upon a minority of three.