LAMBERT, J.
The primary issue we address in this case is whether an autopsy report prepared pursuant to chapter 406, Florida Statutes (2001), is testimonial, hearsay under the Confrontation Clause of the Sixth Amendment to the United States'Constitution. Following a jury trial, Appellant, Luis Rosario, was convicted of aggravated child abuse and first-degree murder of A.S., a four-year-old boy. He argues that his Sixth Amendment right to confront witnesses against him was violated at trial for two reasons. First, the trial court allowed the admission of the autopsy report of A.S. into evidence without requiring the testimony of the medical examiner who prepared the autopsy report. Second, *845 the trial court allowed a surrogate medical examiner, who did not perform or participate during the autopsy, to testify as to the cause of death listed within the report. We agree with both grounds, but under the specific factual circumstances of this case, conclude that these, errors were harmless beyond a reasonable doubt, Accordingly, we affirm.
I. Statement of the Case and Facts
In 2001, Appellant was living with A.S.’s mother and her two children. On April 15, 2001, the four returned home from a pool party. As A-S. was exiting the vehicle, he became tangled in his seatbelt and fell, striking his head on the concrete below. A.S. let out an excruciating scream and began to cry. Appellant then took A.S. inside, gave him a shower, and put him to bed. According to A.S.’s mother, A.S. continued to cry and she could hear Appellant telling him to “shut up” before she went to bed.
In the middle of the night, the mother was awakened by the sounds of Appellant making noises in the house as well as in the garage.[1] When Appellant noticed that the mother was awake, he told her that “[A.S.] is not breathing.” The mother immediately tried to get emergency help for her son. However, according to the mother, Appellant would not let her call 9-1-1. Instead, he retrieved a rifle and a handgun, walked back and forth between A.S.’s room and hers, and told her that he would kill her each time he walked by. Approximately one hour later, the mother was able to get out of her bedroom but noticed that all the house phones had been moved. Although still threatening her, Appellant eventually gave her a phone to call 9-1-1, which she did. By this time, A.S. had white foam coming from his mouth, his lips were purple, and his body was cold. She was unable to resuscitate him.
In the early morning hours of April 16, 2001, A.S. was pronounced dead at the hospital. Doctor Shashi Gore, the then-Chief Medical Examiner for the district, conducted the autopsy of A.S.’s body. As described in the autopsy report, there are five possible manners of death: (1) accident; (2) suicide; (3) homicide; (4) natural; and (5) undetermined. In his original autopsy report dated April 16, 2001, Dr. Gore could not conclude the manner in which A.S. had died; he listed the cause of death as “undetermined.”
' On November 15, 2001,.Dr. Gore filed an addendum to his autopsy report, mentioning contusions in A.S.’s mouth and an abrasion on the back of his ear, but he did not change his original conclusion as to the cause of death. However, in mid-February of 2002, Dr. Gore met. with members of law enforcement and with doctors from Child Protective Services (“CPS”). The next day, Dr. Gore changed his conclusion as to the cause of death to “homicide,” finding that the death was caused by asphyxiation based on “[n]ew evidence.” However, Dr. Gore did not identify the “new evidence” in the autopsy report. •
Appellant continued to reside with A.S.’s mother for approximately two to four months after the child’s death. When first interviewed by law enforcement after the death of her son, the mother never told the police that Appellant had threatened her that night or that he prevented her from calling the police. It was not until seven or eight years later, in 2008 or 2009, that she first advised law enforcement of Appellant’s actions, explaining that she did *846 not tell them previously because she “was very scared.” In April 2010, approximately nine years after the death of A.S., Appellant was indicted for first-degree murder and aggravated child abuse of A.S.
At some point after the autopsy of A.S., Dr. Gore was removed as the Chief Medical Examiner for the district and was replaced by Dr. Jan C. Garavaglia. The State listed Dr. Garavaglia as its medical expert for trial and did not include Dr. Gore as one of its witnesses. During her pretrial deposition, Dr. Garavaglia testified that she did not participate in any way during the autopsy of A.S. Based upon this testimony and Appellant’s belief that the State did not intend to call Dr. Gore as a trial witness, Appellant filed a motion in limine to preclude the State from introducing the testimony of Dr. Garavaglia. Appellant raised no issue with the qualifications of Dr. Garavaglia. However, citing to Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), he argued that Dr. Garavaglia’s testimony would violate his constitutional right to confront witnesses against him because her testimony would be “based upon a review of an autopsy report by someone not physically present at the autopsy.”
A hearing on Appellant’s motion in li-mine was held shortly before trial, which took place in 2013, almost 12 years after AS.’s death. At this hearing, the State advised the court that it did not intend to introduce the autopsy report into evidence at trial. Based upon this representation, the trial court orally announced that it was denying the motion in limine pursuant to Florida case law that permits a surrogate medical examiner to provide his or her opinion as to a victim’s cause of death, despite having not performed the autopsy.[2]
At trial, the State’s theory of the case was that Appellant suffocated A.S. to get him to stop crying. Dr. Gore did not testify at trial. However, notwithstanding the State’s prior representation at the motion in limine hearing, Dr. Gore’s autopsy report was offered and allowed into evidence over Appellant’s Confrontation Clause objection.[3] Additionally, Dr. Gara-vaglia testified that A.S.’s death was due to a homicide and that A.S. was asphyxiated based upon the “compression of [his] neck face down into something.”
Appellant’s defense was that there was no reliable evidence that A.S.’s death was a homicide. Appellant did not testify at trial. His only witness was Dr. Stephen Nelson, the Chief Medical Examiner for another district in Florida. Dr. Nelson was the prior chairman of the State of Florida’s Medical Examiners Commission and was involved in Dr. Gore’s removal from office. Based upon his review of Dr. Gore’s original and amended autopsy report, he concluded that AS.’s cause of death was undetermined, as Dr. Gore had initially reported. Dr. Nelson noted other potential causes of death, including signs of an infectious process present in A.S.’s lungs and that A.S.’s spleen was three to four times larger than the normal size.
Both Dr. Garavaglia and Dr. Nelson testified that they considered Dr. Gore to be generally unreliable. According to Dr. Ga-ravaglia, “He’s had trouble as a medical examiner.”[4] Both doctors also testified *847 that the autopsy report of A.S. contained errors and inconsistencies. For those reasons, Dr. Garavaglia did not form her opinion based on the autopsy .report. Rather, she testified that her conclusion was formed from her “independent evaluation of the photographs” and her personal review of a preserved section of A.S.’s brain that was removed by a neuropathologist near the time of A.S.’s death.
At the conclusion of the trial, the jury found Appellant guilty as charged, and the trial court sentenced him to serve life in prison for the first-degree murder charge and thirty years in prison for the aggravated child abuse charge with the sentences to run concurrently. Appellant timely filed a motion for new trial, asserting, among other things, that the trial court erred in denying his pretrial motion in limine and in admitting Dr. Gore’s autopsy report at trial, as it violated the Confrontation Clause. The trial court denied the motion for new trial and this appeal followed.
II. The Confrontation Clause
A. United States Supreme Court Precedent
The Sixth Amendment to the United States Constitution grants a criminal defendant the right to confront witnesses against him at trial. Amend. VI, U.S. Const. (“In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.... ”). The Sixth Amendment is applicable to the states via the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). “In considering a trial court’s ruling on admissibility of evidence over an objection based on the Confrontation Clause, our standard of review is de novo.” McWatters v. State, 36 So.3d 613, 637 (Fla. 2010) (quoting Milton v. State, 993 So.2d 1047, 1048 (Fla. 1st DCA 2008)).
The seminal case pertaining to a defendant’s Sixth Amendment right to confront witnesses against him is Crawford v. Washington, ■ 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In Crawford, the United States Supreme Court 'addressed whether statements made by the defendant’s wife during a police interrogation were subject to the requirements of the Confrontation Clause. Id. at 38, 124 S.Ct. 1354. The Court held that the right to confront witnesses applies not only to in-court testimony, but also to “testimonial hearsay.” See id. at 59, 68-69, 124 S.Ct. 1354. The Court stated, “Where testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.” Id. at 68, 124 S.Ct. 1354.
In Crawford, the Court receded from its prior decision in Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which allowed an unavailable witness’s out-of-court statement to be admitted “so long as it has adequate indicia of reliability.” Crawford, 541 U.S. at 42, 61-69, 124 S.Ct. 1354 (citing Roberts, 448 U.S. at 66, 100 S.Ct. 2531). The Court stated, “Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.” Id. at 68-69, 124 S.Ct. 1354. Following Crawford, the prosecution may not introduce testimonial hearsay against a criminal defendant, regardless of whether such statements are deemed reliable, unless the defendant has an opportunity to cross-examine the declarant at trial, or unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the witness. See id. at 59, 68-69, 124 S.Ct. 1354.
*848 The Crawford Court expressly declined to “spell out a comprehensive definition of ‘testimonial,’ ” but did state that the text of the Confrontation Clause “applies to ‘witnesses’ against the accused — in other words, those who ‘bear testimony,’ ” and provided a historic definition of “testimony”: “ ‘Testimony,’ in turn, is typically ‘[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.’ ” Id. at 51, 68, 124 S.Ct. 1354 (alteration in original) (quoting 2 N., Webster, An American Dictionary of the English Language (1828)). Further, the Court described various formulations of the “core class of ‘testimonial’ statements” covered by the Confrontation Clause as follows:
“ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, pri- or testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecuto-rially”; “extrajudicial statements ... contained in- formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions”; “statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.”
Id. at 51-52, 124 S.Ct. 1354 (alteration in original) (citations omitted). The Court went on to say that “[statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard.” Id. at 52, 124 S.Ct. 1354.
The Court has not specifically addressed whether an autopsy report is testimonial under the Confrontation Clause. However, since Crawford, the Court has addressed whether similar forensic reports qualified as testimonial hearsay on three separate occdsions. In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the Court held that an affidavit reporting the results of forensic analysis, which identified the material seized by the police and connected to the-'defendant as cocaine, was testimonial.- See id. at 307, 310, 129 S.Ct. 2527. The Court stated, “There is little doubt that the documents at issue in this case fall within the ‘core class of testimonial statements’ thus described” in Crawford. Id. at 310, 129 S.Ct. 2527. After all, the Court’s three aforementioned formulations mentioned affidavits twice. Id. The Court also noted that the affidavits were “made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial” and that “under Massachusetts law the sole purpose of the affidavits was to provide ‘prima facie evidence of the composition, quality, and the net weight’ of the analyzed substance.” Id. at 311, 129 S.Ct. 2527 (quoting Crawford, 541 U.S. at 52, 124 S.Ct. 1354; Mass. Gen. Laws, ch. 111, § 13).
Two years later, the Court decided Bullcoming v. New Mexico, — U.S.-, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), which involved a defendant charged with driving while intoxicated (“DWI”). Id. at 2709. At trial, the prosecution introduced into evidence a report by a laboratory analyst, Curtis Caylor. Id. at 2710, 2712. The report certified that the defendant’s blood-alcohol concentration “was well above the threshold for aggravated DWI” and that all of the procedures were followed while recovering and processing the defendant’s blood sample. Id. at 2709-11. However, Caylor did not testify at trial. Id. at 2709, 2711-12. Instead, the prosecution called as a witness a colleague of Caylor’s — an analyst “who was familiar with the laboratory’s testing procedures, but had neither *849 participated in nor observed the test on [the defendant’s] blood sample.” Id. at 2709. .
The Court held that the “surrogate testimony” violated the Confrontation Clause because it revealed testimonial statements within Caylor’s report. Id. at 2710. Specifically, it found that Caylor was more than a “mere scrivener” as he’made representations in his report that related to past events and human actions that were' not revealed in raw, machine-produced data, thereby making his representations “meet for cross-examination.” Id. at 2714-15. In addition, the Court stated that the Confrontation Clause “does not tolerate dispensing with confrontation simply because the court believes-that questioning one witness about another’s testimonial statements provides a fair enough opportunity for cross-examination.” Id. at 2716. Accordingly, the Court held that the Confrontation Clause precludes the prosecution from introducing “a forensic laboratory report containing a testimonial certification — made for the purpose of proving a particular fact — through the in-court testimony of & scientist who did not sign the certification' or perform or observe the test reported in the certification.” Id. at 2710, 2713.
Most recently, in Williams v. Illinois, — U.S. —-, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012) (plurality opinion), the Court held that the Confrontation Clause was not violated by allowing an expert witness to testify that “a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of petitioner’s blood.” Id. at 2227-28. In Williams, doctors in a local hospital took a vaginal swab of a rape victim. Id. at 2229. Local police sent the swab to the Illinois State Police (“ISP”) lab, which, in turn, sent it to Cellmark for DNA testing. Id. Cellmark sent back a report to ISP containing a male DNA profile produced from semen taken from the swab. Id. A forensic specialist at the ISP lab, Sandra Lambatos, then conducted a computer search that ultimately showed a match to a sample of petitioner’s blood, which had been taken after he was arresta ed on unrelated charges. Id.
The State called Lambatos at trial, and the petitionér objected to her testimony regarding the computer match between the male DNA profile found in the semen and the male DNA profile .from petitioner’s blood. Id. at 2229-30. “The Cellmark report itself was neither admitted into evidence nor shown to the factfinder.” Id. at 2230. The specialist “did not quote or read from the report; nor did she identify it as the source' of any of the opinions she expressed.” Id: The trial court, sitting as the trier of fáct, found no Confrontation Clause violation because the petitioner was afforded an “opportunity to cross-examine the expert who had testified that there was a match between the DNA profiles” and because the Illinois rules of evidence allow an expert “to disclose the facts on which the expert’s opinion is based even if the expert is not competent to testify to those underlying facts.” Id. at 2231. The Supreme Court of Illinois affirmed, finding that the Cellmark report was not offered into evidence to prove the truth of the matter asserted. Id. at 2231-32.
In a splintered opinion, four justices— Chief Justice Roberts, and Justices Alito, Kennedy, and Breyer (the “plurality”)— concurred with the reasoning of the Supreme Court of Illinois. The plurality began its analysis by reiterating that “[i]t has long been accepted that an expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks first-hand knowledge of those facts.” Id. at 2233. The plurality then stated the critical por *850 tion of Lambatos’s testimony, which was a “yes” response to the following question: “Was there a computer match generated of the male DNA profile found in semen from the vaginal swabs of [L.J.] to a male DNA profile that had been identified as having originated from [the defendant]?” Id. at 2236. “According to the dissent, the italicized phrase violated petitioner’s confrontation right because Lambatos lacked personal knowledge that the profile produced by Cellmark was based on the vaginal swabs taken from the victim, L.J.” Id. at 2236. The plurality was not persuaded, however. It responded,
The defect in this argument is that under Illinois law (like federal law) it is clear that- the putatively offending phrase in Lambatos’ testimony was not admissible for the purpose of proving the truth of the matter asserted — i.e., that the matching DNA profile was “found in semen from the vaginal swabs.” Rather, that fact was a mere premise of the prosecutor’s question, and Lambatos simply assumed that premise to be true when she gave her answer indicating that there was a match between the. two DNA profiles. There is no-reason to think that the trier of fact took Lambatos’ answer as substantive evidence to establish where the DNA profiles came from.
Id. Stated differently, the plurality found that the statement was not hearsay. See id.
Of critical importance in Williams, according to the plurality, was the fact that the trier of fact was the trial judge. See id. at 2236-37. The plurality did agree, however, that “[t]he dissent’s, argument would have force if petitioner had elected to have a jury trial,” rather than a bench trial. Id. at 2236. The plurality also concluded as a separate, independent basis that even if the Cellmark report had been introduced for its truth, there would be no Confrontation Clause violation because “the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial.” Id. at 2243. In other words, the plurality found that not only was the statement admitted at trial not hearsay, it was also not testimonial. See id.
Justice Thomas concurred in the judgment but explicitly disagreed with the plurality’s “flawed analysis.” Id. at 2255 (Thomas, J., concurring). According to Justice Thomas, “There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert’s opinion and disclosing that statement for its truth. ‘To use the inadmissible information in evaluating the expert’s testimony, the jury must make a preliminary judgment about whether this information is true.’ ” Id. at 2257 (quoting D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: A Treatise on Evidence: Expert Evidence § 4.10.1, at 196 (2d ed. 2011)). In addition, Justice Thomas stated that the plurality’s “primary purpose” test “lacks any grounding in constitutional text, in history, or in logic.” Id. at 2262. However, Justice. Thomas ultimately found no Confrontation Clause violation “solely because Cellmark’s statements lacked the requisite ‘formality and solemnity* to be considered ‘testimonial’ for purposes of the Confrontation Clause.” Id. at 2255. “The Cellmark report lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact,” he stated. Id. at 2260. As a result, Justice Thomas concluded that the report was “not a statement by a Svitneste]’ within the meaning of the Confrontation Clause.” Id. (alteration in original).
Justices Kagan, Scalia, Ginsburg, and Sotomayor dissented, making (in addition to Justice -Thomas) “[fjive Justices [that] *851 specifically reject[ed] every aspect of [the plurality’s] reasoning and every paragraph of its explication.” Id. at 2265 (Kagan, J., dissenting). The dissent stated that “Lambatos’s testimony is functionally identical to the ‘surrogate testimony1 that New Mexico proffered in Bullcoming, which did nothing to cure the problem identified in Melendez-Diaz....” Id. at 2267. In addition, the dissent rejected the plurality’s assertion that Lambatos’s testimony about the Cellmark report was not admitted for the truth of the matter asserted. See id. at 2268. The dissent also stated that the plurality’s rationale was simply “abdication to state-law labels,” but that state law should not define federal constitutional requirements. Id. at 2272. According to the dissent, “if the plurality were right, the State would have a ready method to bypass the Constitution....” Id. at 2270.
The dissent also rejected the plurality’s “second, independent” rationale utilizing its “primary purpose/accusation” test. Id. at 2272-73. In this regard, the dissent noted:
We have previously asked whether a statement was made for the primary purpose of establishing “past events potentially relevant to later criminal prosecution” — in other words, for the purpose of providing evidence. Davis, 547 U.S., at 822,126 S.Ct. 2266; see also Bullcoming, 564 U.S., at -, 131 S.Ct., at 2716-2717; Bryant, 562 U.S., at [361— 62], [374-76], 131 S.Ct., at 1157, 1165; Melendez-Diaz, 557 U.S., at 310-311, 129 S.Ct. 2527; Crawford, 541 U.S., at 51-52, 124 S.Ct. 1354. None of our eases has ever suggested that, in addition, the statement must be meant to accuse a previously identified individual; indeed, in Melendez-Diaz, we rejected a related argument that laboratory “analysts are not subject to confrontation because they are not ‘accusatory” witnesses.” 557 U.S., at 313, 129 S.Ct. 2527.
Nor does the plurality give any good reason for adopting an “accusation” test. The plurality apparently agrees with Justice BREYER that prior to a ■suspect’s identification, it will be “unlikely that a particular researcher has a defendant-related motive to behave dishonestly.” Ante, at 2250 (BREYER, J., concurring); see ante, at 2243 — 2244 (plurality opinion). But surely the typical problem with laboratory analyses— and the typical focus of cross-examination — has to do with careless or incompetent work, rather than with personal vendettas. And as to that predominant concern, it makes not a whit of difference whether, at the time of the laboratory test, the police already have a suspect.
Id. at 2273-74.
Lastly, the dissent rejected Justice Thomas’s “indicia of solemnity” definition of “testimonial,” noting that the Court previously rejected that requirement in Bull-coming. Id. at 2275-76. The Court also stated that Justice Thomas’s approach, if accepted, “would turn the Confrontation Clause into a constitutional geegaw — nice for show, but of little value” because “[t]he prosecution could avoid its demands by using the right kind of forms with the right kind of language.” Id. at 2276. The dissent closed by noting that the outcome in Williams would lead to uncertainty due to “four Justices’ desire to limit Melendez-Diaz and Bullcoming in whatever way possible.” Id. at 2277. “The better course in this case would have been simply to follow Melendez-Diaz and Bullcoming,” the dissent stated. Id.
B. Federal Circuit Court and State Appellate Court Precedent
Though the United States Supreme Court has not specifically addressed *852 whether, an autopsy report is testimonial hearsay under the Confrontation Clause, numerous state and federal courts have, with conflicting results on the issue. The First and Second Circuit Courts of Appeals have concluded that an autopsy report is nontestimonial. Due to the lack of controlling precedent, in United States v. James, 712 F.3d 79 (2d Cir.2013), cert. denied, — U.S. , 134 S.Ct. 2660, 189 L.Ed.2d 208 (2014), the Second Circuit employed a case-by-case approach.[5] See id. at 97-99. As to one victim’s death, the court held that “the autopsy report was not testimonial because it was not prepared primarily to create a record for use at a criminal trial,” noting that there was no evidence that law enforcement was ever notified that the victim’s death was suspicious or that the medical examiner expected a criminal investigation to result. 'Id. at 99. As to another victim’s death, the court concluded the same, again, because there was “nothing to indicate that the toxicology report was completed primarily to generate evidence for use at a subsequent criminal trial.” Id. at 102.
In United States v. De La Cruz, 514 F.3d 121 (1st Cir.2008), the First Circuit held that an autopsy report is “in the nature of a business record, and business records are expressly excluded from the reach of Crawford.” Id. at 133. But see supra note 5. When the First Circuit Court had the opportunity to - revisit the issue later, it declined, instead reiterating the uncertainty of the law surrounding this, issue. See. Nardi v. Pepe, 662 F.3d 107, 112 (1st Cir.2011) (“[W]e stress the present uncertainty of the law only to emphasize that it was even more unsettled at the time of Crawford just how far that decision would be extended beyond statements taken by the police for specific use at trial. Certainly it was not clearly established law at the time 'of the SJC decision that any. part of Dr. McDonough’s testimony violated clearly established Supreme Court precedent. That is enough to resolve this case.”).[6]
In contrast, the Eleventh and District of Columbia Circuit Courts of Appeals have concluded that an autopsy report is testimonial. In United States v. Ignasiak, 667 F.3d 1217 (11th Cir.2012), the Eleventh Circuit held that due to the statutory framework under Florida law, in which the Medical Examiners Commission was created and exists within the Department of Law Enforcement, the autopsy reports in that case were testimonial because they were “made under circumstances which would.lead an objective witness reasonably to believe that the statement would be available for use at a later trial.” Id. at 1231-32 (quoting United States v. Baker, *853 432 F.3d 1189, 1203 (11th Cir.2005)). Additionally, the court also stated that medical examiners are not mere scriveners, but rather, their reports include observational data and conclusions that are “the product of skill, methodology, and judgment.” Id. at 1232-33. The. District of Columbia Circuit utilized the same rationale in United States v. Moore, 651 F.3d 30, 73 (D.C.Cir.2011) (“Law enforcement officers thus not only observed the autopsies, a fact that would have signaled to the medical examiner that the autopsy might bear on a criminal investigation, they participated in the creation of reports. Furthermore, the autopsy reports were formalized in signed documents titled ‘reports.’ These factors, combined with the fact that each autopsy found the manner of death to be a homicide caused by gunshot wounds, are ‘circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.’ ”), affd in part sub nom. Smith v. United States, —U.S.-, 133 S.Ct. 714,184 L.Ed.2d 570 (2013).
State courts are also split on this issue.[7] However, in Florida, the only case to address the issue is Banmah v. State, 87 So.3d 101 (Fla. 3d DCA 2012). In Ban-mah, the Third District Court of Appeal held that an autopsy report is nontestimo-nial and that the surrogate medical exam: iner’s testimony at trial did not violate the Confrontation Clause. See id. at 103-04. Three rationales can be gleaned from the opinion. ■ '
First, the court noted that “Florida cases explicitly hold that it is proper to permit a substitute medical expert to testify as to cause of death despite the fact that the expert did not perform the autopsy, when the substitute medical expert relies on the autopsy report.” Id. at 103. In this regard, according to the court, “the determination of whether the witness was qualified to express an expert opinion' was a matter within the discretion of the trial judge, and finding no clear showing of error, this ruling will not be reversed.” Id. (citing Brennan v. State, 754 So.2d 1, 4 (Fla.1999)). Second, the court stated that “autopsy reports are non-testimonial because they are prepared pursuant to a statutory duty, .and not solely for use in prosecution.” Id. The court did not provide any additional explanation or citation concerning this conclusion. See id. Third, the court stated, “most obviously, the victims died because they were shot; this is the basis of the charges against the defendant and there is no evidence to contradict this.” Id. at 103-04. “The autopsy photos were admitted without objection, and show gunshot wounds. [The surrogate medical examiner’s] testimony was subject to cross-examination, and based on the record and case precedent, we find no error in the trial court’s admission of [the surro,gate medical examiner’s] testimony concerning the cause of death.” Id. at 104.
*854 Cognizant of the differing analyses of the numerous eases generally discussing the meaning of testimonial hearsay and specifically discussing whether an autopsy report is testimonial hearsay under the Sixth Amendment, we now turn to the facts of the instant case.
III. The Autopsy Report
A. Testimonial Hearsay
Because the Confrontation Clause only applies to testimonial hearsay, Davis v. Washington, 547 U.S. 813, 823-26, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), we first must determine whether Dr. Gore’s autopsy report was hearsay. Under federal and Florida law, “hearsay” is defined as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” § 90.801(1)(c), Fla. Stat. (2013); see Fed. R.Evid. 801(c). Here, we have little difficulty in concluding that the autopsy report admitted at Appellant’s jury trial qualifies as hearsay. It included out-of-court statements made by Dr. Gore and was offered by the State to prove the truth of the matters asserted in the report, i.e., that A.S.’s death was a homicide, among other things.[8]
We next determine whether Dr. Gore’s autopsy report was testimonial. Since there is no precise definition of “testimonial” within the meaning of the Sixth Amendment, we first begin our analysis by attempting to ascertain the intent of the framers of the Constitution. See Lawnwood Med. Ctr., Inc. v. Seeger, 990 So.2d 503, 510 (Fla.2008) (“Our goal in construing a constitutional provision is to ascertain and effectuate the intent of the framers and voters.” (citing Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm’n, 838 So.2d 492, 501 (Fla.2003))). As explained by Thomas Jefferson:
“On every question of construction, [we should] carry ourselves back to the time when the Constitution was adopted; recollect the spirit manifested in the debates; and instead of trying [to find] what meaning may be squeezed out of the text, or invented against it, conform to the probable one in which it was passed.”
McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 372, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (alterations in original) (quoting T. Jefferson, Letter to William Johnson (June 12, 1823), in 15 Writings of Thomas Jefferson 439, 449 (A. Lipscomb ed. 1904)).
On more than one occasion, the United States Supreme Court has recognized that autopsy reports have historically been treated in early America as testimonial, notwithstanding their potential status as nontestimonial in England during the same time. See Melendez-Diaz, 557 U.S. at 322, 129 S.Ct. 2527 (“Respondent seeks to rebut this limitation by noting that at common law the results of a coroner’s inquest were admissible without an opportunity for confrontation. But as we have previously noted, whatever the status of coroner’s reports at common law in England, they were not accorded any special status in American practice.”); Crawford, 541 U.S. at 47, n. 2, 124 S.Ct. 1354 (“There is some question whether the requirement of a prior opportunity for cross-examination applied as well to statements taken by a coroner, which were also authorized by the Marian statutes. Whatever the En *855 glish rule, several early American authorities flatly rejected any special status for coroner statements.” (citations omitted)); see also Giles v. California, 554 U.S. 353, 39900, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (Breyer, J., dissenting) (“Coroner’s statements seem to have had special.status that may sometimes have permitted the admission of prior unconfronted testimonial statements despite lack of cross-examination. But, if so, that special status failed to survive the Atlantic voyage.”). The fact that the framers of the Constitution categorically viewed autopsy reports as testimonial weighs heavily in favor of concluding that autopsy reports are testimonial today. However, we do not end our analysis there.
To further assist our analysis of whether Dr. Gore’s autopsy report is testimonial, we also consider the'circumstances under which the report was prepared, the primary purpose of the report, and the solemnity of the report. See Williams, 132 S.Ct. at 2243 (plurality opinion); Williams, 132 S.Ct. at 2259-61 (Thomas, J., concurring); Melendez-Diaz, 129 S.Ct. at 2532; Davis, 547 U.S. at 822, 126 S.Ct. 2266; Crawford, 541 U.S. at 51, 124 S.Ct. 1354. In general, when a medical examiner is asked to perform an autopsy following a suspicious death, the role of the medical examiner is to “serve the criminal justice system as medical detectives by identifying and documenting pathologic findings in suspicious or violent deaths and testifying in courts as expert medical witnesses.” See State v. Jaramillo, 272 P.3d 682, 686 (N.M.Ct.App.2011) (quoting Strengthening Forensic Science in the United States: A Path Forward 244 (Nat’l Research Council of the Nat’l Acads.2009)). During Appellant’s trial, the State’s expert, Dr. Gara-vaglia, confirmed that the role of medical examiners in Florida is no different. There, she stated:
A By law we have the duty to investigate deaths that fall under the .law, basically anybody that dies suddenly and unexpectedly, anybody for any trauma; the law states which cases have on the [sic] reported to us. And we do our own independent investigation. I gather information by the. police, gather all the information available that, we need to determine cause and manner of death and then by law to write a report and sign a death certificate.
Q So the .medical examiner’s office looks at cases that might be homicide, might not be homicide, might be suicide, might be accidental death?
A Right, any death that is any type of trauma, any kind of suspicious death, anybody that just dies suddenly and unexpectedly and not expected to die. Anything that is definitely not natural has to be reported to the medical examiner’s office.
In'Florida, medical examiners are governed by chapter 406, Florida Statutes. In Ignasiak, the court explained the statutory duties of medical examiners in Florida and their statutory relationship with law enforcement as follows:
Under Florida law, the Medical Examiners Commission was created and exists within the Department of Law Enforcement. Fla. Stat. § 406.02. Further, the Medical Examiners Commission itself must include one member who is a state attorney, one member who is a public defender, one member who is sheriff, and, one member who is the attorney general or his designee, in addition to five other non-criminal justice members. Id. The medical examiner for each district “shall determine the cause of death” in a variety of circumstances and “shah, for that purpose, make or have performed such examinations, investigations, and autopsies as he or she shall *856 deem necessary or as shall be requested -by the state attorney.” Fla. Stat. § 406.11(1). Further, any person who becomes aware of a person dying under circumstances described in section § 406.11 has a duty to report the death to the medical examiner. Id. at § 406.12. Failure to do so is a first degree misdemeanor. Id.
“Upon receipt of such notification ... the district medical examiner ... shall examine or otherwise take charge of the dead body and shall notify the appropriate law enforcement agency.” Fla. Stat. § 406.13. Then, after the cause of death is determined, the medical examiner is required to “report or make available to the state attorney, in writing, her ... determination as to the cause of death.”
Id. The medical examiner may retain “[a]ny evidence or specimen coming into the possession of said medical examiner in connection with any investigation or autopsy,” or deliver it to law enforcement. Id. Likewise, law enforcement has a duty to make “[a]ny evidence material to the ... cause of death” in the possession of law enforcement available to the medical examiner. Fla. Stat. at 406.14.
Ignasiak, 667 F.3d at 1231-32 (alterations in original) (footnote omitted).
Due to this statutory relationship with law enforcement and the “suspicious” circumstances that give rise to, and in fact require, the creation of an autopsy report in Florida, we conclude that an autopsy report prepared pursuant to chapter 406 is presumptively testimonial in nature. Not unlike a witness’s written recitation of facts to a police officer following a suspected crime, such autopsy reports are “made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.” Crawford, 541 U.S. at 51-52, 124 S.Ct. 1354. As explained in Jammillo, a case that dealt with a similar statutory framework in New Mexico:
There is no reason to suspect that a pathologist with considerable experience and knowledge of statutory' duties to report suspicious deaths to law enforcement officers would not anticipate criminal litigation to result from his determination that the trauma-related death of a child was the result of homicide. The statements in the report were made to establish the facts related to [the decedent’s] cause of death; ruling the death a homicide reflects directly on the issue of a defendant’s guilt or innocence. No question existed that the report would support and be used in a criminal prose-eution.
Jammillo, 272 P.3d at 686, cited with approval in State v. Navarette, 294 P.3d 435, 441 (N.M.2013); see also Martinez v. State, 311 S.W.3d 104, 111 (Tex.App.2010) .(“Since the statutory basis giving rise to Frost’s duty to perform the autopsy was that the circumstances surrounding Garcia’s death warranted the suspicion that the death was caused by unlawful means, we hold that Frost’s autopsy report was a testimonial statement and that Frost was a witness within the meaning of the Confrontation Clause of the Sixth Amendment.” (citation omitted)); State v. Kennedy, 229 W.Va. 756, 735 S.E.2d 905, 917 (2012) (stating that the West Virginia “Legislature specifically noted that with respect to ‘death investigations,’ the medical examiner operates with independent authority and, in that regard, part of his duties is to develop opinions for use in judicial proceedings”).
To the extent that they define when a statement is testimonial, we also find that Dr. Gore’s autopsy report satisfies the primary purpose and solemnity tests applied by the Court in Melendez-Diaz, Bullcom- *857 ing, and Williams. Pursuant to the historical definition provided in Crawford, a testimonial statement is a “solemn declaration or affirmation made for the purpose of establishing or proving some fact.” 541 U.S. at 51, 124 S.Ct. 1354. Here, similar to the forensic analysis report in Melendez-Diaz, which was required under Massachusetts law, the primary purpose of an autopsy report prepared pursuant to chapter 406 is clearly to establish or prove some fact, such as the cause and manner of death or the details of the body that lead to that conclusion.[9] Florida law requires the medical examiner to memorialize in writing his or her findings “as to the cause of said death” and provide them to the state attorney. § 406.13, .Fla. Stat. (2013). The fact that the autopsy report has an evidentiary purpose is especially apparent considering the fleeting nature of the evidence at issue, i.e., human remains, and the potentially criminal nature of the circumstances, i.e., a suspicious death. See Melendez-Diaz, 557 U.S. at 318 n. 5, 129 S.Ct. 2527 (stating that autopsies cannot be repeated).
Here, unlike the report in Williams, the circumstances surrounding the creation of the autopsy report strongly suggest that the primary purpose of the report, viewed objectively, was to create evidence for use at trial. See Williams, 132 S.Ct. at 2243 (plurality opinion). Not only was the report prepared pursuant to chapter 406, Florida Statutes, evidence at trial also showed that almost immediately after being contacted by law enforcement and a pediatrician from CPS, Dr. Gore changed his conclusion in the autopsy report concerning A.S.’s cause of death to “homicide,” just as the Court in Melendez-Diaz predicted may happen. 557 U.S. at 318, 129 S.Ct. 2527 (“Forensic evidence is not uniquely immune from the risk of manipulation. ... A forensic- analyst responding to a request from a law enforcement official may feel pressure — or have an incentive— to alter the evidence in a manner favorable to the prosecution.”); see also State v. McFeeture, 36 N.E.3d 689, 719 (Ohio Ct. App. May 14, 2015) (stating that “the change of manner of death from undetermined to homicide was indeed to target [the defendant]”); People v. Williams, No. 318856, 2015 WL 558307, at *2 (Mich.Ct. App. Feb. 10, 2015) (unpublished opinion) (finding that the medical examiner changed the manner of death recorded on her autopsy reports from accidental to homicide “[u]pon learning from police that the fire was intentionally set”). At this point, it was reasonably foreseeable to any objective observer that the report may be used in a subsequent criminal prosecution to establish that AS.’s death was caused by a homicide. Therefore, Dr. Gore’s autopsy report satisfies the primary purpose test.
We further conclude that the fact that the autopsy report was not sworn to or certified- does not make it nontestimonial. This argument was expressly rejected in Bullcoming.[10] 131 S.Ct. at 2717. Here, as in Melendez-Diaz and Bullcoming, law enforcement provided evidence (A.S.’s body) to a state medical examiner’s office that was required by law to assist in police investigations. See id. Dr. Gore then “tested”- the evidence by performing an autopsy and prepared a report concerning *858 the result of his analysis. See id. His report was then “formalized” in a signed document. See id. Thus, not only does the report satisfy the primary purpose test, it is also sufficiently solemn.
In sum, we conclude that an autopsy report prepared pursuant to chapter 406 is testimonial hearsay under the Confrontation Clause. With respect to the broad statement in Banmah that “autopsy reports are non-testimonial because they are prepared pursuant to a statutory duty, and not solely for use in prosecution,” we respectfully disagree. 87 So.3d at 103. Regardless of whether the report is actually used at trial, it is reasonably foreseeable to believe that it may be used prosecutorially, especially when the medical examiner concludes that the cause of death was a homicide, as in this case. See Crawford, 541 U.S. at 51, 124 S.Ct. 1354 (stating that testimonial statements include “material such as affidavits ... or similar pretrial statements that declarants would reasonably expect to be used prosecutorially” (emphasis added)); James, 712 F.3d at 109 (Eaton, J., concurring). The Confrontation Clause has never mandated that a statement’s sole use must be for prosecution in order for it to be testimonial. Moreover, the fact that an autopsy report is not “accusatory” or “inherently inculpa-tory” in some circumstances does not make it nontestimonial in all circumstances. See Bullcoming, 131 S.Ct. at 2717 (rejecting respondent’s argument that the affirmations made by the analyst were not testimonial because they were not “adversarial” or “inquisitorial”); Melendez-Diaz, 557 U.S. at 313-15, 129 S.Ct. 2527 (rejecting respondent’s argument that the analysts were not subject to confrontation because they were not “accusatory” or conventional witnesses); see also Williams, 132 S.Ct. at 2273-74 (Kagan, J., dissenting); Navarette, 294 P.3d at 438-39. When a report prepared pursuant to chapter 406 is introduced “against” the defendant at trial, as in this case, he must be given an opportunity to cross-examine the medical examiner who prepared the report. Because Appellant was not afforded an opportunity to cross-examine Dr. Gore, we find that his Sixth Amendment right to confront witnesses was violated.
B. Harmless Error
Having concluded that Appellant’s right to confront witnesses was violated by the admission of Dr. Gore’s autopsy report, we next address whether this error was harmless. “Violations of the Confrontation Clause, where preserved, are subject to harmless error analysis.” Corona v. State, 64 So.3d 1232, 1241 (Fla. 2011) (citing State v. Contreras, 979 So.2d 896, 911 (Fla.2008)). A harmless error analysis requires this court to “determine whether ‘there is a reasonable possibility that the error affected the verdict.’ ” Id. at 1243 (quoting State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986)). The burden to show that the error was harmless is on the State. Id. “If the appellate court cannot say beyond a reasonable doubt that the error did not affect the verdict, then the error is by definition harmful.” DiGuilio, 491 So.2d at 1139.
We find that the admission of Dr. Gore’s autopsy report was harmless beyond a reasonable doubt. The ultimate goal of the Confrontation Clause is to ensure reliability of evidence. See Melendez-Diaz, 557 U.S. at 317, 129 S.Ct. 2527 (quoting Crawford, 541- U.S. at 61, 124 S.Ct. 1354). Here, the admission of Dr. Gore’s autopsy report, under the unique circumstances of this case, was not prejudicial because the report was concededly unreliable. Dr. Gore was considered incompetent by both testifying experts. In particular, both sides presented testimony concerning the inconsistencies and errors *859 within Dr. Gore’s report in this case and in the past. In other words, it was readily apparent at trial that Dr. Gore’s report was not rehable evidence. As a result, we do not believe that if the report was not admitted into evidence, the result of the trial would have been different.' Stated differently, we do not find that the admission of the report affected the verdict.
Moreover, Dr. Garavaglia concluded that A.S.’s death was a homicide based on personally observed facts. At trial, Dr. Gara-vaglia concluded that A.S.’s death was a homicide based on five “facts”: (1) A.S. had injuries on his body, such as an abrasion on his face, which indicated “he was recently beaten”; (2) A.S. had petechiae (broken blood vessels) and red marks/contusions on the back of his neck, “indicating there was pressure put on the back of his neck”; (B) A.S. had pulmonary edema (swelling of the brain), which indicated that A.S. had a seizure, “probably [due to a] lack of oxygen”; (4) A.S. had “two small little marks on the inside of his lip, both upper and lower, which are consistent with those lips being pressed up against his teeth”; and (5) A.S. had a stretch abrasion on the back of his ear and two little marks on his earlobe “that could be fingernail marks.” Based on these facts, Dr. Gara-vaglia concluded that A.S. was held down by his neck and suffocated. Dr. Garavag-lia testified that she confirmed facts one, two, four, and five by looking at nontesti-monial photographs of A.S.’s body that were also admitted into evidence.[11] Dr. Garavaglia testified that she confirmed fact three by personally examining a preserved portion of A.S.’s brain under a microscope. Like the testifying witness in Williams, Dr. Garavaglia did not state that the report was the basis of her opinion. See 132 S.Ct. at 2229-81. In fact, because Dr. Garavaglia considered Dr. Gore to be unreliable, Dr. Garavaglia made a point to base her opinion on objective data that could not be misrepresented, either intentionally or unintentionally, by Dr. Gore.
In combination with AS.’s mother’s compelling testimony regarding Appellant’s suspicious behavior around the time of AS.’s death, Dr. Garavaglia’s independent conclusion was more than sufficient to support Appellant’s convictions.[12] We are admittedly perplexed why the State chose to have the autopsy report admitted into evidence, especially considering that the State acknowledged that the doctor who prepared the report was not competent and the prosecutor had previously informed the court and the defense that he did not intend to offer the report into evidence. However, based on the totality of the circumstances in this case, we are persuaded beyond a reasonable doubt that the admission of Dr. Gore’s autopsy report did not affect the jury’s verdict. Accordingly, although it was a violation of the Confrontation Clause to admit Dr. Gore’s autopsy report into evidence, such error was harmless. See State v. Carey, No. M2013-02483-CCA-R3-CD, 2015 WL 1119454, at *16 (Tenn.Crim.App.2015) (slip opinion) (Woodall, J., concurring) (“Error in the admission into evidence of the autopsy report as an exhibit was rendered harmless beyond a reasonable doubt by [the surrogate medical examiner’s] testimony.”).
IV. The Surrogate Medical Examiner’s Testimony
As a second, independent basis for reversal, Appellant argues that it was also a *860 violation of the Confrontation Clause to allow Dr. Garavaglia to testify based on Dr. Gore’s report. In response, the State argues that it is proper under Florida law for a substitute medical examiner to testify based on inadmissible evidence. Normally, this issue does not arise where the report itself was admitted into evidence. The introduction of a .surrogate medical examiner’s testimony generally involves concern over whether the surrogate medical examiner is serving as an improper conduit for what would otherwise be inadmissible evidence. See State v. Stanfield, 158 Idaho 327, 347 P.3d 175, 186 (2015) (“A defendant’s right to confrontation is violated when ‘an expert acts merely as a well-credentialed conduit,’ and does not provide any independent, expert opinion.” (quoting United States v. Ramos-Gonzalez, 664 F.3d 1, 5-6 (1st Cir.2011)); see also Linn v. Fossum, 946 So.2d 1032, 1037-38 (Fla.2006) (“Florida courts have routinely recognized that an expert’s testimony ‘may not merely be used as a conduit for the introduction of the otherwise inadmissible evidence.’ ” (quoting Erwin v. Todd, 699 So.2d 275, 277 (Fla. 5th DCA 1997))). In this case, the inadmissible evidence was Dr. Gore’s autopsy report, which was admitted into evidence. Therefore, having previously concluded that its admission whs harmless error, we find no reason to reverse simply because a surrogate medical examiner also revealed some of the details mentioned in the report during her testimony. We briefly write on this issue to respond to the State’s argument.
Florida law generally permits an expert to offer an opinion based on inadmissible evidence. See § 90.704, Fla. Stat. (2013). Section 90.704, Florida Statutes, which governs the basis of opinion testimony by experts, provides as follows:
The facts or data upon, which an expert bases an opinion or inference may be those perceived by, or made known to, the expert at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or, data need not be admissible in evidence. Facts or data that are otherwise inadmissible may not be disclosed to the jury by the- proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert’s opinion substantially outweighs their prejudicial effect.
Id. The Florida Supreme Court has specifically concluded that section 90.704 permits a medical expert to testify as to their opinion of the cause of death, despite the fact that the expert did not perform the autopsy.' See Schoenwetter v. State, 931 So.2d 857 (Fla.2006); Geralds v. State, 674 So.2d 96 (Fla.1996); Capehart v. State, 583 So.2d 1009 (Fla.1991). In Bdnmah, the Third District Court relied on Schoenwetter when it stated that “Florida cases explicitly hold that it is proper to permit a substitute medical expert to testify as to cause of death despite the fact that the expert did not perform the autopsy, when the- substitute medical expert relies on the autopsy report.” Banmah, 87 So.3d at 103. Here, the trial court also relied on Schoenwetter when it denied Appellant’s motion in limine. ‘
In Schoenwetter, the defendant pleaded guilty to two counts of first-degree murder, among other charges. See 931 So.2d at 861. During the penalty phase before a jury, a medical examiner who did not perform the autopsies of the victims testified regarding his ¿pinion as to the cause and manner of death. Id. at 870. On appeal, the defendant argued that this testimony violated his right to confront witnesses and that the trial court erred in relying on Geralds to allow the medical examiner to testify. Id. Relying on Capehart and Ger- *861 aids, the Florida Supreme Court held that the trial court did not abuse its discretion in allowing the surrogate medical examiner to testify about the autopsy performed by the original medical examiner because the original medical examiner was unavailable to testify and there was no dispute that the surrogate medical examiner was a qualified expert who had reviewed the autopsy reports, photos, and notes and had spoken with the medical examiner who performed the autopsy, id. at 870-71.
However, because the issue was not preserved, the court expressly declined to address whether the defendant’s right of confrontation was violated. The court stated:
Schoenwetter’s reliance on Crawford in arguing that the medical examiner’s reports, notes, and statements were testimonial hearsay is misplaced. The record does not reflect any specific objection by counsel based on [the surrogate medical examiner’s] reliance on actual conversations with [the original medical examiner] or based on [the surrogate medical examiner’s] quoting or testifying to anything specific that [the original medical examiner] related, to him. There was no specific objection by defense counsel based on a confrontation violation; therefore, this issue has not been preserved for review.
Id. at 871. Therefore, similar to the court in Geralds and Capehart, the court in Schoenwetter only addressed whether section 90.704 was violated; not whether the Confrontation Clause was violated. As a result, -those cases do not necessarily permit a surrogate medical examiner to testify to conclusions or other subjective analysis made in an autopsy report where the defendant objects on Confrontation Clause grounds.
While the court in Banmah was correct that “the determination of whether the witness was qualified to express an expert opinion was a matter within the discretion of the trial judge,” 87 So.3d at 103, this does not affect our analysis of the federal constitutional question. Just because evidence is admissible under -section-90.704, like in Schoenwetter, does not mean that the evidence does not violate the. Confrontation Clause. See Williams, 132 S.Ct. at 2272 (Kagan, J., dissenting). For the surrogate medical examiner’s testimony to be admissible, it must satisfy both section 90.704 and the Confrontation Clause. Here, there was no showing by the State that Dr. Gore was unavailable to testify, and Appellant did not object to Dr. Gara-vaglia’s qualifications or argue that her testimony would violate section .90.704. Therefore, we find that Schoenwetter is inapplicable to the facts .of this case. .More importantly, we expressly disagree with the State that it was sufficient for Confrontation Clause purposes to allow Appellant to cross-examine Dr. Garavaglia abo.ut Dr. Gore’s report. To. the extent that Banmah says otherwise, we' again disagree.
■Nevertheless, this is not to say that a surrogate medical examiner- may - never testify as to the cause and manner of death of a victim after reviewing another medical examiner’s report. So long as testimonial hearsay is not revealed at trial through the surrogate medical examiner’s testimony, the Confrontation Clause is not implicated.
Here, Dr. Garavaglia revealed testimonial hearsay included within Dr. Gore’s report when she testified to Dr. Gore’s conclusion concerning A.S.’s cause of death.[13] This violated the Confronta *862 tion Clause. However, as previously explained, Dr. Garavaglia did not rely on Dr. Gore’s conclusion as to A.S.’s cause of death. She formed her own independent conclusion that A.S.’s death was a homicide. Again, the bases of Dr. Garavaglia’s conclusion were personally observed or confirmed by Dr. Garavaglia prior to testifying. Therefore, it was harmless error for Dr. Garavaglia to testify based on Dr. Gore’s report.- See Cuesta-Rodriguez v. State, 241 P.3d 214, 231 (Okla.Crim.App.2010) (holding Confrontation Clause error was harmless where “[the surrogate medical examiner’s] testimony about [the decedent’s] external injuries, as described in [the medical examiner’s] report and accompanying hand-drawn diagrams were largely cumulative of the same injuries depicted in photographs of [the decedent’s] face and head taken at the murder scene that were properly entered into evidence with the [detective’s] testimony”); Martinez v. State, 311 S.W.3d 104, 113 (Tex.App.2010) (“Looking specifically to those statements from [the medical examiner’s] autopsy report that were admitted into evidence through [the surrogate medical examiner’s] testimony, we conclude that the error was harmless. [The surrogate medical examiner] identified that [the medical examiner] concluded that the cause of Garcia’s death was asphyxiation. However, as discussed above, [the medical examiner’s] conclusion regarding cause of death was cumulative of [the surrogate medical examiner’s] opinion and of the photographs that showed extensive injuries to Garcia’s neck consistent with strangulation.”); Wood v. State, 299 S.W.3d 200, 214 (Tex.App.2009) (holding error was harmless where “[t]he bulk of [the surrogate medical examiner’s] testimony was devoted to describing and explaining what was shown in the photographs taken during the autopsy”).
V. Conclusion
We hold that an autopsy report prepared pursuant to chapter 406, Florida Statutes, is testimonial hearsay under the Confrontation Clause. Such autopsy reports are admitted for the truth of the matter asserted, include solemn declarations or affirmations of fact, and are prepared for the primary purpose of establishing some fact that is likely to be used at trial. In this case, Dr. Gore did not testify at trial, and Appellant was not provided a prior opportunity to cross-examine him. Therefore, it was error for the court to allow the admission of Dr. Gore’s autopsy report into evidence. However, we find that such error was harmless because, under the totality of circumstances, there is no reasonable possibility that the admission of the report affected the outcome of the trial.
We also hold that notwithstanding section 90.704, Florida Statutes, the Confrontation Clause is violated by a surrogate medical examiner’s testimony that reveals testimonial hearsay contained within an otherwise inadmissible autopsy report. In this case, Dr. Garavaglia’s testimony as to Dr. Gore’s conclusion that A.S.’s death was a homicide was improper. However, Dr. Garavaglia also testified to her own independent conclusion that A.S.’s death was a homicide. Accordingly, considering the admission of the entire autopsy report was harmless error, so was the testimony of Dr. Garavaglia that revealed statements within the report.
Based on our holdings, we certify conflict with Banmah v. State, 87 So.3d 101 (Fla. 3d DCA 2012).
*863 AFFIRMED; CONFLICT CERTIFIED.
SAWAYA and TORPY, JJ., concur.

. Appellant’s neighbor testified that, in the middle of the night, Appellant moved his car from the driveway into .the garage.

. The court subsequently entered a one-page form order without explication or citations of authority.

. The autopsy report included Dr.. Gore's original findings and conclusion as well as his amended findings and conclusions.

.For example, in a prior case, Dr. Gore went into great detail in his autopsy report about a heart that did not exist because it had previously been donated and transplanted prior to the autopsy.

. In United States v. Feliz, 467 F.3d 227 (2d Cir.2006), the Second Circuit previously held that autopsy reports qualified as public records and "that public records are nontestimo-nial, and not subject to the strictures of the Confrontation Clause." Id. at 237. However, in James, the court conceded that the 2009 Melendez-Diaz decision "cast doubt” on its Feliz decision. James, 712 F.3d at 89. In Melendez-Diaz, the Court rejected respondent’s argument that "the analysts’ affidavits are admissible without confrontation because they are ‘akin to the types of official and business records admissible at common law.’ ” 557 U.S. at 321-22, 129 S.Ct. 2527.

. Other federal circuit courts, when addressing petitions for habeas corpus relief, have also found that there is no "clearly established law” on whether an autopsy report is testimonial under the Confrontation Clause. See, e.g., Hensley v. Roden, 755 F.3d 724, 735 (1st Cir.2014), cert. denied, 135 S.Ct. 964 (2015); Mitchell v. Kelly, 520 Fed.Appx. 329, 331 (6th Cir.), cert. denied, —— U.S.-, 134 S.Ct. 312, 187 L.Ed.2d 221 (2013); McNeiece v. Lattimore, 501 Fed.Appx. 634, 636 (9th Cir.2012), cert. denied, — U.S. -, 133 S.Ct. 2357, 185 L.Ed.2d 1081 (2013); Vega v. Walsh, 669 F.3d 123, 127 (2d Cir.2012).

. For state courts that have concluded that an autopsy report is testimonial hearsay under the Confrontation Clause, see, for example: People v. Lewis, 490 Mich. 921, 806 N.W.2d 295 (2011); State v. Davidson, 242 S.W.3d 409 (Mo.Ct.App.2007); State v. Jaramillo, 272 P.3d 682 (N.M.Ct.App.2011); State v. Locklear, 363 N.C. 438, 681 S.E.2d 293 (2009); Cuesta-Rodrigiiez v. State, 241 P.3d 214 (Okla.Crim.App.2010); Martinez v. State, 311 S.W.3d 104 (Tex.App.2010); and State v. Kennedy, 229 W.Va. 756, 735 S.E.2d 905 (2012). For state courts that have concluded that an autopsy report is not testimonial hearsay, see, for example: State v. Medina, 232 Ariz. 391, 306 P.3d 48 (2013), cert. denied, — U.S.-, 134 S.Ct. 1309, 188 L.Ed.2d 304 (2014); People v. Leach, 366 Ill.Dec. 477, 980 N.E.2d 570 (Ill.2012); State v. Russell, 966 So.2d 154 (La.Ct.App.2007); State v. Maxwell, 139 Ohio St.3d 12, 9 N.E.3d 930 (2014), cert. denied, 135 S.Ct. 1400 (2015); and State v. Cutro, 365 S.C. 366, 618 S.E.2d 890 (2005).

. The fact that the report may qualify under a state hearsay exception is not significant to our analysis. State law labels have no effect on the admissibility of the statement under the Confrontation Clause. See Melendez-Diaz, 557 U.S. at 322-24, 129 S.Ct. 2527; Crawford, 541 U.S. at 61-69, 124 S.Ct. 1354; supra note 5.

. Dr. Gore’s report stated that the autopsy of A.S.’s body was performed pursuant to chapter 406, Florida Statutes.

. Justice Thomas is the only Supreme Court Justice that adheres to the view that heightened solemnity is a testimonial prerequisite, see Williams, 132 S.Ct. at 2275-77 (Kagan, J., dissenting), and even he agreed that the report in Bnllcoming was sufficiently solemn, although it was not sworn to or certified, see Bullcoming, 131 S.Ct. at 2717.

. Appellant did not object to the introduction of the photographs into evidence.

. For this reason, we affirm, without further discussion, the trial court's denial of Appellant’s motion for judgment of acquittal, which he raised as an additional ground for reversal.

. Dr. Garavaglia also revealed other statements contained within Dr. Gore's report during her testimony. However, based on our conclusion that the admission of the entire report was harmless error, we decline to determine whether these statements and find *862 ings, individually, were also testimonial hearsay.